In re ADVISORY FROM
THE GOVERNOR.

No. 93–120 M.P.

Supreme Court of Rhode Island.

Nov. 15, 1993.

William P. Robinson, III, Elizabeth Murdock Myers, for Governor's Office.

Lauren S. Zurier, Aaron Weisman, for Office of the Atty. Gen.

Gary Yesser, for RI Ethics Com'n.

Anthony F. Cottone, for ACLU.

Peter McGinn, Gregory Pastore, Providence, for Marsha Reback et al.

Lauren Jones, Caroline Cook Cornwell, for Common Cause.

Bruce Pollock, Michael DiBiase, Providence, for RI Bar Ass'n.

To His Excellency Bruce Sundlun, Governor of the State of Rhode Island and Providence Plantations:

We have received from Your Excellency a request for our written opinion in accordance with article 10, section 3, of the Rhode Island Constitution on four specific questions. The members of this court have been asked to determine (1) whether the provisions contained in G.L.1956 (1990 Reenactment) § 36–14–5, subsections (n) and (o), as amended by P.L.1992, ch. 436, § 1, are constitutional under section 1 of the Fourteenth Amendment to the United States Constitution and under article 1, section 2, of the Rhode Island Constitution "and/or seriously impinge upon the ability of the members of the executive, legislative, or judicial branches to perform" their duties; (2) whether the provisions contained in § 36–14–5(a) are constitutional under section 1 of the Fourteenth Amendment to the United States Constitution and under article 1, section 2, of the Rhode Island Constitution "and/or seriously impinge upon the ability of the members of the executive, legislative, or judicial branches to perform" their duties; (3) whether the exercise by the Ethics Commission of the authority granted to it under the Code of Ethics, § 36–14–11, specifically Ethics Advisory No. 13 and Ethics Advisory Opinion No. 92–30, are constitutional under section 1 of the Fourteenth Amendment to the United States Constitution and under article 1, section 2, of the Rhode Island Constitution "and/or seriously impinge upon the ability of the members of the executive, legislative, or judicial branches to perform" their duties; and (4) whether the Ethics Commission Regulations 36–14–5006, 36–14–5007, and 36–14–5008 are constitutional under section 1 of the Fourteenth Amendment to the United States Constitution and under article 1, section 2, of the Rhode Island Constitution "and/or seriously impinge upon the ability of the members of the executive, legislative, or judicial branches to perform" their duties.

Briefs were submitted by both the Governor's office and the Attorney General's office. In addition, amicus curiae briefs were submitted by the following interested parties: the Rhode Island Ethics Commission, Common Cause of Rhode Island, the American Civil Liberties Union, and the Rhode Island Bar Association. Marcia B. Reback, president of the Rhode Island Federation of Teachers and a member of the Rhode Island Retirement Board, filed a brief as an intervenor.

I

### The Propriety of the Request

 We must first address a preliminary procedural issue that will clarify our rendition of this advisory opinion. This court issues an advisory opinion to the Governor when the question or questions propounded "concern the constitutionality of existing statutes which require implementation by the Chief Executive." *In re Advisory Opinion (Chief Justice)*, 507 A.2d 1316, 1319 (R.I. 1986). The question or questions propounded must have some relationship to the official duties of the branch propounding the question. *Id.* This court avoids issuing advisory opinions in circumstances not constitutionally mandated. *Id.* We only advise the Chief Executive when the question or questions propounded have a "bearing upon a present constitutional duty awaiting performance * * * ." *Id.*

The questions propounded by the Governor mainly concern his ability to appoint qualified individuals to certain government positions. "[W]e find that no power of appointment is vested in the governor, save to fill vacancies temporarily existing * * * ." *Election of Officers by the Senate*, 28 R.I. 607, 616, 69 A. 555, 559 (1908). *See* R.I. Const., art. 9, sec. 5, and art. 4, sec. 4. "[O]ur own constitution does not make appointment to office an executive function * * * ." 28 R.I. at 618, 69 A. at 560. Although many of our laws creating state agencies, commissions, and boards require the Governor to appoint some of the members to those bodies, that power is not a general per se enumerated constitutional duty of the Governor. *Cf. In re Advisory Opinion to the Governor*, 504 A.2d 456 (R.I.1986) (our advisory opinion citing Rhode Island Constitutional provision that directs the Governor to appoint officers

to fill vacancies *temporarily existing* ). Upon a review of the questions before us, it is evident that the Governor has no present constitutional duty awaiting performance. In spite of the procedural deficiency ingrained in this request, we shall exercise our discretion and waive the defect, except as noted in parts III and IV of this advisory opinion, because this is an instance in which the public and constitutional importance is paramount. *See In re Advisory Opinion (Chief Justice)*, 507 A.2d at 1319–20.

"Questions of ethics become ones of coloring inside the lines." Beth Nolan, *Regulating Government Ethics: When It's Not Enough to Just Say No*, 58 Geo. Wash. L.Rev. 405, 407 (1990).

"It appears to me that in Ethics, as in all other philosophical studies, the difficulties and disagreements, of which history is full, are mainly due to a very simple cause: namely to the attempt to answer questions, without first discovering precisely *what* question it is which you desire to answer." George Edward Moore, *Preface to Principia Ethica*, (1903).

A particular profession or occupation should not carry a stigma simply as a result of public perception, for it is the human spirit that is common to all, and that spirit can take on different faces, both praiseworthy and contemptible. It is not a duty of this court to mandate morals; that is a duty of society. Self-respect, honor, and integrity are inherent in the mission of reacting to society's expectations for its public officials. Society's expectations mirror either incompatible disagreements between how one is expected to act and how one actually acts or continual hardships in discerning the theoretical requirements for what is defined as ethical. "Law reflects but in no sense determines the moral worth of a society. The values of a reasonably just society will reflect themselves in a reasonably just law." Nolan, 58 Geo. Wash. L.Rev. at 406 n. 4.

The questions propounded to us by the Governor concern "the appearance of impropriety" of certain government officials. Perception and the appearance of impropriety are not always truth or reality. Any ethical mandate or regulation must not ignore history's unyielding tug of war between the world as it is and the world as men and women perceive it. Society is inundated with the pious mouthings of statements and opinions that are in sharp conflict with the behaviors sanctioned. We are reminded that the "appearance of impropriety alone [may be] 'simply too slender a reed on which to rest a [decision] * * *.'" *Olivier v. Town of Cumberland*, 540 A.2d 23, 27 (R.I.1988). As we begin our constitutional analysis, we are mindful of the impact, in the present legal, political, and social environments, that our decision will have.

## II

### The Revolving–Door Question

The Governor first challenges § 36–14–5, subsections (n) and (*o*), as well as Ethics Commission Regulations 36–14–5006 and 36–14–5007. Section 36–14–5(n) provides:

"No state elected official, while holding state office and for a period of one (1) year after leaving state office, shall seek or accept employment with any other state agency, as defined in § 36–14–2(4)(a), other than employment which was held at the time of the official's election or at the time of enactment of this subsection, except as provided herein.

"Nothing contained herein shall prohibit any general officer or the general assembly from appointing any state elected official to a senior policy-making, discretionary, or confidential position on the general officer's or the general assembly's staff, and in the case of the governor, to a position as a department director; nor shall the provisions herein prohibit any state elected official from seeking or accepting a senior policy-making, discretionary, or confidential position on any general officer's or the general assembly's staff, or from seeking or accepting appointment as a department director by the governor.

"Nothing contained herein shall prohibit a state elected official from seeking or being elected for any other constitutional office.

"Nothing contained herein shall prohibit the Rhode Island Ethics Commission from

authorizing exceptions to this subsection where such exemption would not create an appearance of impropriety."

Section 36–14–5(*o*) places similar restrictions on persons holding senior policy-making, discretionary, or confidential positions on the staff of any state-elected official or of the General Assembly. Subsection (*o*) contains exclusions similar to those noted under subsection (n) and adds an exclusion for those persons holding senior policy-making, discretionary, or confidential staff positions with a minimum of five years of uninterrupted state service.

Regulation 36–14–5006 provides:

"No elected or appointed official may accept any appointment or election by the body of which he or she is or was a member, to any position which carries with it any financial benefit or remuneration, until the expiration of one (1) year after termination of his or her membership in or on such body, unless the Ethics Commission shall give its approval for such appointment or election, and, further provided, that such approval shall not be granted unless the Ethics Commission is satisfied that denial of such employment or position would create a substantial hardship for the body, board, or municipality."

Regulation 36–14–5007 provides:

"No member of the General Assembly shall seek or accept state employment as an employee or consultant, not held at the time of the member's election, while serving in the General Assembly and for a period of one (1) year after leaving legislative office."

For the sake of brevity and to ensure ease of judicial analysis, we choose to analyze several of the Governor's claims against the aforementioned statute and regulations together, under a "revolving door" analysis. Before we can group the statute and regulations for review purposes, we must first dispose of an argument asserted by the Ethics Commission (commission).

■ The commission contends that § 36–14–5, subsections (n) and (*o*), is unconstitutional because it is inconsistent with Ethics Commission Regulations 36–14–5006 and 36–

14–5007 in violation of article 3, section 8, of the Rhode Island Constitution.

"We have ruled that the terms of article 3, section 8, expressly confer upon the commission the limited and concurrent power to enact substantive *ethics laws.* Accordingly, it logically follows that such an affirmative grant of power to the commission necessarily implies a limitation of the same on the part of the General Assembly or any other body. *This is not to say, however, that the General Assembly is prohibited from enacting ethics laws altogether; rather, the General Assembly is merely limited to enacting laws that are not inconsistent with, or contradictory to, the code of ethics adopted by the commission.*" (Emphasis added.) *In re Advisory Opinion to the Governor,* 612 A.2d 1, 14 (R.I. 1992).

The commission asserts that the General Assembly has created exceptions to Regulations 36–14–5006 and 36–14–5007 by allowing exemptions for "about 2 dozen top administrative positions on the staffs of general offices, as well as a small number of [other] long-term staff members." The commission argues that the regulations would delay appointments of *all* advisors and directors whereas § 36–14–5, subsections (n) and (*o*), would not. Section 36–14–5, subsections (n) and (*o*), allows the commission to grant an exemption in circumstances in which the exemption does not create an "appearance of impropriety." The commission argues that the regulations grant an exemption only in stricter circumstances, when a candidate has unique and necessary qualifications for a position.

We have determined that the commission has the concurrent power to enact ethics *laws. See* 612 A.2d at 14.

"[S]tatutes that relate to the same subject matter should be considered together so that they will harmonize with each other and be consistent with their general objective scope. * * * This rule of construction applies even though the statutes in question contain no reference to each other and are passed at different times." *Rhode Island Higher Education Assistance Au-*

*thority v. Rhode Island Conflict of Interest Commission*, 505 A.2d 427, 428 (R.I.1986).

The statute's subsections, while less constrictive than the regulations, are not inconsistent. Our preference is to interpret statutes that relate to the same subject matter so that each may be given its full effect. *See id.* In light of the more narrow nature of the commission's regulations, it is not persuasive to suggest that the regulations supersede the statute. *Id.* at 430. The regulations complement the statute which broadens their application to a larger group of individuals. An individual could be found to have violated the regulations while being in compliance with the statute. The statute and the regulations are not inconsistent but are compatible. The General Assembly has properly enacted the statute under its concurrent jurisdiction in the ethics arena.

## A. Equal-Protection Claim

The Governor claims that § 36–14–5, subsections (n) and (o), and Ethics Commission Regulations 36–14–5006 and 36–14–5007 (revolving-door legislation) violate the Equal Protection Clauses of the United States and the Rhode Island Constitutions by creating an unconstitutional classification of individuals who may not be considered for public office. The Governor asserts that the revolving-door legislation mandates that those parties who have been employed by the state within the past year cannot be considered for certain public offices. The Governor, relying on *Cummings v. Godin*, 119 R.I. 325, 377 A.2d 1071 (1977), and *Dwyer v. Conflict of Interest Commission*, 646 F.Supp. 707 (D.R.I.1986), contends that the revolving-door legislation restricts a public official's right to hold a successive public office and, accordingly, should be subject to a high level of judicial scrutiny.

"[T]he constitutional amendment that became art. 1, sec. 2, was passed to bring Rhode Island equal-protection law on par with federal equal-protection law." *Kleczek v. Rhode Island Interscholastic League, Inc.*, 612 A.2d 734, 738 (R.I.1992). Therefore, by applying the federal analysis in the equal-protection area, we shall answer the Gover-

nor's question under both the United States and Rhode Island Constitutions.

■■■ Our analysis pursuant to an equal-protection claim commences with a consideration of the level of judicial scrutiny that the challenged legislation or action requires. A rational-basis scrutiny is applied to social or economic legislation, presuming it to be valid if the classification drawn is rationally related to a legitimate state interest. *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985). Classifications based on gender or illegitimacy receive an intermediate standard of review and will survive such scrutiny if they are substantially related to a legitimate state interest. *Id.* at 440–41, 105 S.Ct. at 3254–55, 87 L.Ed.2d at 320–21. Classifications based on race, alienage or national origin, or classifications that impinge upon fundamental rights, are subject to strict scrutiny and will survive an equal-protection claim only if they are "suitably tailored to serve a compelling state interest." *Id.* at 440, 105 S.Ct. at 3254, 87 L.Ed.2d at 320; *see also Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465, 471 (1988).

■■■ The Governor asserts that the revolving-door legislation restricts a public official's right to hold a successive public office. The Governor relies on *Cummings* for the proposition that the holding of public office is a significant form of political expression and thus is one of the rights included within the ambit of the First Amendment. *Cummings*, 119 R.I. at 335–36, 377 A.2d at 1076. Consequently, the Governor avers, a high level of scrutiny must be applied. The *Cummings* court analyzed a municipal ordinance under the First Amendment and did not consider an equal-protection argument. *Id.* at 329–36, 377 A.2d at 1073–76. To the extent that the *Cummings* decision mandated that all barriers to a person's right to hold public office demand a high level of judicial scrutiny, or to the extent that *Cummings* identified candidacy for public office as a fundamental right, those beliefs must be revisited in light of *Clements v. Fashing*, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982).

*"Far from recognizing candidacy as a 'fundamental right,'* we have held that the existence of barriers to a candidate's access to the ballot 'does not of itself compel close scrutiny.' " (Emphasis added.) *Id.* at 963, 102 S.Ct. at 2843, 73 L.Ed.2d at 516. Since candidacy for public office is not a fundamental right, then neither can the right to be appointed to a public office be a fundamental right. There is no per se fundamental right to government employment. *See Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520, 524 (1976).

The Supreme Court has departed from traditional equal-protection analysis in two lines of ballot-access cases. *Clements,* 457 U.S. at 964–66, 102 S.Ct. at 2844–45, 73 L.Ed.2d at 516–17. The Court has applied something more than the traditional rational-relationship test in ballot-access cases involving classifications based upon wealth and those classifications that burden small political parties or independent candidates. *Id.* Neither type of classification is implicated by the revolving-door legislation.

Because this is an advisory opinion, we indulge in a digression suggested by the Attorney General and in fact struggle to identify the instant situation as one that involves access to the ballot or as a ballot-access question. Subsections (n) and (*o*) of § 36–14–5 have a specific exclusion for seeking election to state constitutional office. Regulation 36–14–5007 has been interpreted by the commission as also allowing a public official to seek elective office. (*See* part II E of this opinion.) "Our primary concern is with the tendency of ballot access restrictions 'to limit the field of candidates from which voters might choose.' Therefore '[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.' " *Anderson v. Celebrezze,* 460 U.S. 780, 786, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547, 556 (1983). "Our ballot access cases * * * focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessar-

ily burdens the 'availability of political opportunity.' " *Clements,* 457 U.S. at 964, 102 S.Ct. at 2844, 73 L.Ed.2d at 516. The public positions to which the revolving-door legislation applies are appointed positions or are positions elected from a state or a municipal governing body. They are not positions that are elected by the general electorate. Therefore, the voters' interest or influence is extremely diluted and attenuated at best. The unrestricted vote they cast is for the person or the body exercising the power to appoint or elect. The revolving-door legislation does not unfairly burden those with political opportunities or aspirations. *See id.* We do not view the revolving-door legislation as per se restricting an individual's access to the electoral ballot since the general electorate has a de minimis impact on the person appointed or elected.

Even if this were a narrower ballot-access restriction, the one-year waiting period dictated by the revolving-door legislation places a *"de minimis* burden on the political aspirations of a *current* office holder. * * * A *'waiting period' is hardly a significant barrier to candidacy."* (Emphasis added.) *Clements,* 457 U.S. at 967, 102 S.Ct. at 2846, 73 L.Ed.2d at 518 (holding that a two-year waiting period was insignificant and required only a rational predicate to survive an equal-protection challenge). The revolving-door legislation does not directly interfere with an individual's right to be a candidate for public office. The revolving-door legislation simply limits one employment option, for a one-year period, available to the covered class of individuals. Consequently any suggestion by *Cummings* that a higher level of scrutiny applies has been replaced by the implications of the *Clements* decision. Because the challenged legislation does not fall within a category that would require heightened scrutiny and since we view the legislation as social, the rational-relationship test is applicable.

In order for the revolving-door legislation to pass constitutional equal-protection muster, it must be shown that the legislation is rationally related to a legitimate state interest. "The mere fact that the legislation could have been drawn more precisely will not invalidate the statute. * * * 'The consti-

tutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective.'" *In re Advisory Opinion to the Governor (DEPCO)*, 593 A.2d 943, 950 (R.I.1991). "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 399 (1961).

The revolving-door legislation addresses the imbroglio of public officials who use their present positions and contacts as unfair bargaining tactics in gaining future employment with the state or a municipality. "[A] democracy is effective only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions * * * ." *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 562, 81 S.Ct. 294, 315, 5 L.Ed.2d 268, 295 (1961). The legislative aim of the revolving-door provisions is to ensure that public officials adhere to the highest standards of conduct, avoid the appearance of impropriety, and do not use their positions for private gain or advantage. *See* R.I. Const., art. 3, sec. 7. The integrity of our government officials is quintessential to our system of representation. In general the purpose of revolving-door provisions is to prevent "government employees from unfairly profiting from or otherwise trading upon the contacts, associations and special knowledge that they acquired * * * ." *Forti v. New York State Ethics Commission*, 75 N.Y.2d 596, 605, 554 N.E.2d 876, 878, 555 N.Y.S.2d 235, 237 (1990).

> "The aim of every political constitution is, or ought to be, first to obtain for rulers men [or women] who possess most wisdom to discern, and most virtue to pursue, the common good of society; *and in the next place, to take the most effectual precautions for keeping them virtuous whilst they continue to hold their public trust.*" (Emphasis added.) *The Federalist* No. 57, at 383 (James Madison) (B. Wright ed. 1961).

We believe that the revolving-door legislation is an effective device by which the public trust may be enhanced. There is a legitimate purpose in abridging the abuse of public office. The drafters of the revolving-door legislation could have reasonably concluded that the possibility of one's unjustly entrenching oneself in a public position, by moving from one state or municipal position to another, could be greatest for those positions to which the one-year waiting period was made applicable. This court imposes similar one-year waiting periods on former law clerks wishing to practice before this court (with a complete ban on any consultation and assistance on any case that was pending during the clerk's position) and on any former government attorney wishing to represent a private client before the agency in which he or she was once employed. (*See* R.I. Supreme Court Rules Article II, Rule 11, and R.I. Rules of Professional Conduct 1.11(b).)

The drafters may have concluded that the risk of undue influence is great in the positions that it identified. Their actions, taken as a whole, were a result of the difficult task of reaching an "acceptable compromise among the important competing concerns, most notably the need to impose stricter controls while, at the same time, ensuring that government service does not become so unattractive that talented individuals are deterred from entering government service." *Forti*, 75 N.Y.2d at 604–05, 554 N.E.2d at 878, 555 N.Y.S.2d at 237. No government branch is immune from "influence peddling," and we believe that there was an adequate basis for the ethical restraints imposed. *See id.* at 613, 554 N.E.2d at 883, 555 N.Y.S.2d at 242. "The [drafters are] certainly entitled to consider that '[e]vils in the * * * field may be of different dimensions and proportions' so that different remedies are required." *Id.* The revolving-door legislation rests on a rational predicate and promotes integrity and public confidence in government.

### B. Due-Process Claim

■ The Governor next contends that the revolving-door legislation violates due process as guaranteed under the Fourteenth Amendment to the United States Constitution and article 1, section 2, of the Rhode

Island Constitution. The Governor first avers that the revolving-door legislation violates due process by relying on an irrebuttable presumption that certain public officials are not appropriate candidates for state employment. The Governor contends that irrebuttable legislative presumptions are constitutionally disfavored. In support of his position the Governor cites a number of cases, principally, *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973). Upon a review of *Vlandis,* and the other cases cited in support of the Governor's position, we note that the deprivations questioned in the cases upon which the Governor relies are of a more permanent nature than the deprivation that is now before us. In *Vlandis,* the Court struck down a Connecticut statute that provided, that if a student's address was outside the state at the time of his or her application to a state university, that person remained a non resident so long as he or she remained at the state university. *See id.* "We hold only that a *permanent irrebuttable* presumption * * * is violative of the Due Process Clause * * * ." (Emphasis added.) *Id.* at 453, 93 S.Ct. at 2237, 37 L.Ed.2d at 72; *see also Starns v. Malkerson,* 326 F.Supp. 234 (D.Minn.1970), *summarily affirmed,* 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971) (upholding Minnesota's residency requirement because the student could rebut the presumption, after having lived in the state for one year, by presenting some evidence of residency status).

The Governor's irrebuttable-presumption argument is flawed for two reasons. First, the presumption in the revolving-door legislation is not permanent; rather, it is for a limited duration, a one-year period. Second, the presumption is rebuttable as the legislation so provides. Section 36–14–5, subsections (n) and (*o*), provides that the commission is authorized to grant exemptions in situations in which the exemption would not create an appearance of impropriety. Regulation 36–14–5006 provides the commission with the opportunity to grant an exemption if the denial of the questioned employment would create a substantial hardship. The presumption contained in the revolving-door legislation is either rebuttable, temporary, or both. Consequently the revolving-door legis-

lation does not violate due process because it does not contain an irrebuttable presumption.

The Governor contends that the revolving-door legislation also violates due process because it is arbitrary and irrational. In his initial memorandum the Governor did not explicitly state whether he was challenging the revolving-door legislation on a substantive or on a procedural due-process basis but rather relied on cases from both constitutional realms. In his subsequent reply memorandum the Governor clarified his position and stated that he was not raising a procedural due-process challenge.

> "When local economic or social regulation is challenged as violating *substantive due process,* courts consistently defer to legislative determinations as to the desirability of particular statutory schemes. Unless a state law trammels fundamental personal rights, we are to presume that state legislatures have acted within their constitutional power and are to require only that the law 'bears a reasonable relation to the state's legitimate purpose.'" (Emphasis added.) *The Oklahoma Education Association v. The Alcoholic Beverage Laws Enforcement Commission,* 889 F.2d 929, 935 (10th Cir.1989) (quoting *Murphy v. Matheson,* 742 F.2d 564, 575 (10th Cir.1984) and *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 125, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91, 99 (1978)); *see also In re Advisory Opinion to the House of Representatives,* 519 A.2d 578, 582 (R.I.1987) (citing *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and *Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976)).

The Governor avers that the "sweeping stigmatization of a significant pool of candidates for public office lacks a rational relationship to any legitimate state purpose and violates due process." The Governor readily admits that the level of judicial scrutiny in the due-process arena is the rational-relationship test. Our holding in the first part of this opinion under our equal-protection analysis applies equally to the Governor's due-process claim. Because the revolving-door legislation

does not affect any fundamental right, a deferential rational-relationship test applies, and the revolving-door legislation passes constitutional muster under a substantive due-process analysis. (*See* rational-relationship analysis at part II A of this opinion.) "From our conclusion under equal protection, however, it follows *a fortiori* that the [revolving-door legislation] does not violate the Fourteenth Amendment's Due Process Clause." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 470 n. 12, 101 S.Ct. 715, 727 n. 12, 66 L.Ed.2d 659, 673 n. 12 (1981).

Because the Governor challenges the revolving-door legislation on the grounds that it arbitrarily denies a person the opportunity for individual consideration of his or her qualifications and cited both substantive and procedural due-process cases in his initial memorandum, we deem it appropriate to respond to this clouded challenge on what we perceive to be a procedural due-process vein. "[P]rocedural due-process requires certain minimal standards of notice, hearing, and opportunity to respond adequately before a governmental agency may effectively deprive an individual of life, liberty, or property." *State v. Manocchio*, 448 A.2d 761, 764 n. 3 (R.I.1982); *see also Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government[al] function involved as well as of the private interest that has been affected by governmental action." *Cafeteria & Restaurant Workers Union Local 473, AFL–CIO v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230, 1236 (1961). Because the Governor has not specifically identified what deprivation of life, liberty, or property interest is unconstitutionally affected by the revolving-door legislation, our analysis appears meaningless. It is our position that the Governor does not propose a clear enough claim for this court to analyze it under a procedural due-process examination.

In rejecting a similar procedural due-process challenge, the United States Court of Appeals for the Tenth Circuit held that the proponents of the argument misunderstood the nature of procedural due process. "When the legislature passes a law which affects a general class of persons, those persons have all received procedural due process—the legislative process." 2 Rotunda & Nowak, *Treatise on Constitutional Law: Substance and Procedure*, 2nd § 17.8 at 646 (1992).

> "The purpose of procedural due process is to provide a hearing to ensure that the statute's commands are fairly and not erroneously applied to an individual. * * * But 'there is no requirement of a procedure to determine the basis for a[ ] [state] action which affects an individual where there are no factual issues in dispute.' " *The Oklahoma Education Association*, 889 F.2d at 936.

In *Oklahoma Education Association* state employees sued the Alcoholic Beverage Laws Enforcement Commission, seeking a declaration that a state constitutional provision precluding state employees from working in the liquor industry was unconstitutional. The *Oklahoma Education Association* court rejected the state employees' claim that individualized hearings were necessary to redress the arbitrariness of the challenged statute on the grounds that it was nothing more than a "veiled challenge to the substance of the [statute]." *Id.* at 936. The court held that it was undisputed that the state employees were in fact state employees and therefore were expressly prohibited from obtaining liquor licenses in the state. *Id.*

Our Legislature and the commission have rejected the individualized-hearing approach and have instead adopted a flat one-year waiting period. Had we a sufficient claim upon which to analyze the revolving-door legislation under a procedural due-process inquiry, we are inclined to believe that we would have followed the analysis outlined in the *Oklahoma Education Association* decision and thus would have rejected any procedural due-process challenge.

### C. Overbreadth Claim

The Governor claims that subsections (n) and (o) of § 36–14–5 are overly broad because the statute excludes from consideration a substantial pool of eligible candidates while

leaving less qualified persons available for the positions. The Governor, relying on *Cummings* and *Martin v. State Board of Elections,* 119 R.I. 556, 381 A.2d 234 (1977), claims that the state has no sufficient interest in barring a public official from succeeding to another state position. The Governor avers that the statute goes beyond the scope of what is relevant to the well-being of state government.

■■■■■ "An overbroad statute is one that is designed to burden or punish activities which are not constitutionally protected, *but the statute includes within its scope activities which are protected by the first amendment."* (Emphasis added.) 4 Rotunda & Nowak, *Treatise on Constitutional Law: Substance and Procedure,* 2nd § 20.8 at 26 (1992).

"[T]he Court has altered its traditional rules of standing to permit—*in the First Amendment area*—'attacks on *overly broad statutes* with no requirement that the person making the attack demonstrate that his [or her] own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' * * * Litigants, therefore, are permitted to challenge a statute not because their own rights of *free expression are violated,* but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally *protected speech or expression."* (Emphasis added.) *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S. Ct. 2908, 2916, 37 L.Ed.2d 830, 840 (1973). "But the plain import of our cases is * * * that facial overbreadth adjudication is an exception to our traditional rules of. practice and *that its function, a limited one at the outset * * * forbids the State to sanction moves from 'pure speech' * * * [to] conduct * * * ."* (Emphasis added.) *Id.* at 615, 93 S.Ct. at 2917, 37 L.Ed.2d at 842. In challenges not implicating the First Amendment, the Court will not hear a case from a person to whom application of the legislation is constitutional on the basis that its application may be unconstitutional in regard to other people in different situations. *See* 4 Rotunda, § 20.8 at 26–27. Conse-

quently, in order for the Governor to challenge subsections (n) and (*o*) of the statute, under the overbreadth doctrine he must identify a specific First Amendment restraint. The restrictions challenged in both *Cummings* and *Martin* prohibited an individual from holding *any* elective office. *See Cummings,* 119 R.I. at 328, 377 A.2d at 1072, and *Martin,* 119 R.I. at 557–58, 381 A.2d at 235. Those restraints may have more severe First Amendment implications than the interest affected in this instance. We believe that a person's interest in obtaining state employment, as minimally restricted by the statute, does not fall within the ambit of the First Amendment, nor does the statute reach the harshness of the restrictions noted in *Cummings* and *Martin.* Consequently, because the Governor fails to identify a First Amendment interest involved in this situation, the Governor does not have the necessary standing to raise an overbreadth challenge to subsections (n) and (*o*).

### D. Separation-of-Powers Claim

■■■■ The Governor further contends that the revolving-door legislation violates the separation-of-powers doctrine. The Governor asserts that appointing qualified and experienced individuals to assist him in running the affairs of the state is an integral element of his duties. The revolving-door legislation, he asserts, substantially impinges on his duty by severely curtailing the pool of candidates from which he can choose his appointees.

The doctrine of separation of powers is an inherent and integral element of the republican form of government. *In re Advisory Opinion to the Governor,* 612 A.2d at 18. " '[O]ne branch of government may exercise some of the powers of the other departments " * * * when it is not an assumption of the whole power of another department," * * * .' " *Id.* We have adopted the separation-of-powers test as formulated in *Chadha v. Immigration and Naturalization Service,* 634 F.2d 408 (9th Cir.1980), *aff'd,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); *see State v. Jacques,* 554 A.2d 193, 195–96 (R.I.1989).

" '[T]he twin purposes of preventing concentrations of power dangerous to liberty

and of promoting governmental efficiency are served if we define a constitutional violation of the separation of powers as [1] an assumption by one branch of powers that are central or essential to the operation of a coordinate branch, [2] provided also that the assumption disrupts the coordinate branch in the performance of its duties and [3] is unnecessary to implement a legitimate policy of the Government.'" *Id.* at 196.

The Governor contends that subsections (n) and (o) of § 36–14–5 impermissibly impinge on his appointment power. According to the first prong of the *Chadha* test, we must first determine whether the legislative branch has assumed powers that are essential to the operation of the executive branch. *See Jacques,* 554 A.2d at 196. The Legislature has assumed no power through the administration of the statute and cannot force upon the Governor appointments that he deems unacceptable. The Legislature has imposed certain minimal temporary restrictions on the pool of available applicants. Subsections (n) and (o) do not contain any language that vests the Legislature with any appointment power. Consequently the Legislature has not, directly or indirectly, assumed any essential power of the Governor. Thus subsections (n) and (o) survive the first prong of the *Chadha* test.

Likewise, the subsections also survive the second and third prongs of the *Chadha* test. *See Jacques,* 554 A.2d at 196. Although the statute does have a minimal impact on the number of available candidates that the Governor may choose from, that impact does not disrupt his ability to carry out his duties. We view the definition of disruption as the act of "throw[ing] into confusion or disorder." The American Heritage Dictionary, 408 (Second College Ed.1982). The Governor is unlimited in his choices of appointments to important policy-making, confidential, and discretionary positions. The subsections temporarily limit the Governor's choices for other appointments to the judiciary, various commissions, and state agencies. The restriction is limited to a one-year period and applies to a very small number of candidates when compared to the entire pool of applicants

available to the Governor. This finite restriction cannot be said to throw into confusion the Governor's ability to carry out his duties. We are not persuaded that the Governor's inability to appoint this limited number of individuals would render him incapable of performing the necessary duties of his office. As we have discussed in an earlier part of this opinion, the legislative aim of the revolving-door legislation is to ensure that public officials avoid the appearance of impropriety and enhance public confidence and integrity in our system of representation. We believe that the statute is designed to achieve a legitimate purpose. *See Jacques,* 554 A.2d at 196. In our view, subsections (n) and (o) of § 36–14–5 do not violate the separation-of-powers doctrine.

■■ The Governor also contends that Regulations 36–14–5006 and 36–14–5007 violate the separation-of-powers doctrine. The Governor contends that Regulation 36–14–5007 substantially impinges on his appointment power while Regulation 36–14–5006 restricts legislators and local officials from fulfilling their duty to make appointments to public office. This court has specifically stated that the commission cannot assume powers that are central or essential to the operation of the Governor's office or of the General Assembly. *In re Advisory Opinion to the Governor,* 612 A.2d 1 (R.I.1992). This court has reserved the power to decide, on a case-by-case basis, whether the actions of the commission have violated the separation-of-powers doctrine. *Id.* at 20.

"[T]he commission may not set standards that *seriously impinge* upon the executive or the legislative branch's ability to perform the usual or ordinary duties for which each is elected, including the appointment of various officials to public office. * * * [U]nless the commission is usurping the power of another [branch] or coercively influencing the [other branch], there is no violation of the doctrine of separation of powers." (Emphasis added.) *Id.* at 19.

The instant regulations do not deprive the Governor or the General Assembly or local officials of their power to make appointments. As we have stated, the de minimis restriction that is placed on the power to

make appointments is temporary and is not seriously intrusive of either the executive or the legislative branch's power. For the same reasons stated in the previous section in which we analyzed subsections (n) and (o) of § 36–14–5, we believe that the regulations do not violate the separation-of-powers doctrine.

### E. First-Amendment Claim

The Governor further asserts that Regulation 36–14–5007 violates the First Amendment to the United States Constitution and article 1, section 21, of the Rhode Island Constitution by infringing on an individual's right to seek an elective office. The Governor claims that the regulation will prevent present legislators from seeking election to other state offices for one year after leaving legislative office. If the regulation contained such a ban, there may be constitutional implications warranting a stricter analysis. The commission does not interpret Regulation 36–14–5007 as denying legislators a right to seek elective office. In its memorandum, the commission admits that "[t]he Commission's interpretation of its Regulation 36–14–5007 would not prohibit legislators to run for elected office. [T]he Commission does not interpret Regulation 5007 as preventing the members of the General Assembly from immediately seeking *election* to an office, considering that the potential for influence peddling in one's current position is negligible in connection with a subsequent election to an office by popular vote." Neither the commission's interpretation nor our interpretation of the regulation would bar access to elective office; hence, we do not analyze the regulation under the Governor's First Amendment challenge.

### III

### The Substantial–Conflict Legislation

The Governor is also challenging G.L.1956 (1990 Reenactment) § 36–14–5(a), as amended by P.L.1992, ch. 436, § 1 and 36–14–7, as amended by P.L.1992, ch. 132, § 1, asserting that the statutes violate the separation-of-powers doctrine and rights guaranteed by the First Amendment. Section 36–14–5(a) prohibits an individual from having

"any interest, financial or otherwise, direct or indirect, or engag[ing] in any business, employment, transaction, or professional activity, or incur[ring] any obligation * * * which is in substantial conflict with the proper discharge of his or her duties or employment in the public interest * * * ."

A substantial conflict arises when a person has reason to believe or expect that he or she or any person within his or her family or a business associate or a business he or she is employed by or represents will derive monetary gain or loss by reason of his or her official duty. *See* § 36–14–7(a). There is no substantial conflict if the public official, or the other related party noted in § 36–14–7(a), is affected by the activity to

"no greater extent than any other similarly situated member of the business, profession, occupation, or group, or of the significant and definable class of persons within the business, profession, occupation or group." Section 36–14–7(b).

After receiving the Governor's request, we learned that the questions propounded regarding §§ 36–14–5(a) and 36–14–7 are involved in litigation now pending in this court and in the District Court. We have heard oral argument in respect to case No. 92–433, *Edward D. DiPrete v. Richard W. Morsilli,* during the month of October 1993 and the District Court is currently reviewing case No. 61–93–13305, *State v. Thomas F. Fay.*

"[G]rave difficulties could follow if we were to give a purely advisory opinion upon the proposed question, only to be confronted later with the necessity of deciding the same question after a hearing, upon review or otherwise, in the litigated case. * * * [L]egal and constitutional rights [could be] unnecessarily prejudiced by our having reached a considered opinion * * * upon a material question of law which we knew to have been involved in [a] conviction, without first having afforded [the defendant] a full hearing * * * ." *Opinion to the House of Representatives,* 88 R.I. 396, 399–400, 149 A.2d 343, 345 (1959); *see also Opinion to the House of Representatives,* 433 A.2d 944 (R.I.1981).

We have recognized this situation as the pending-litigation exception to the rendition

of an advisory opinion. In view of the likely and grave consequences noted, we reluctantly decline to express any opinion at this time on the questions propounded regarding §§ 36–14–5(a) and 36–14–7.

The Governor also claims that Ethics Advisory No. 13 and Ethics Advisory Opinion No. 92–30 contain an unconstitutional proscription of legislators' First Amendment rights. The purpose of Ethics Advisory No. 13 was to publicize the commission's views and interpretations of the code of ethics as they apply to members of the General Assembly who are in some manner employed or associated with outside business interests that may come before the General Assembly. Ethics Advisory No. 13 concluded that the code of ethics prohibited legislators from introducing, discussing, or voting on legislation affecting the legislator's own or related party's financial interests. This conclusion carried an exclusion to the complete prohibition similar to the one noted in § 36–14–7(b). The advisory stated that there "will probably not be a" conflict if the interest of the public figure is affected to no greater or lesser extent than the interests of all of the other members of an affected group to which the public figure or related party belongs. The advisory concluded that if a legislator, because of the code of ethics, is prohibited from introducing, discussing, or voting on legislation on the floor of the legislative chamber, he or she is nevertheless permitted to testify and give his or her opinions before legislative committees that may be holding public hearings on the affected legislation. The commission noted that advisory No. 13 could not address every situation imaginable and encouraged public officials to seek advice about how the law applies to their own situations.

In advisory opinion No. 92–30 the commission rendered an opinion pursuant to a request from Senator Sandra K. Hanaway of Cumberland (Hanaway). Hanaway is employed by an insurance agency that earns 90 percent of its income in connection with the sale of personal automobile and homeowner's insurance policies. Hanaway inquired whether the ethics laws allowed her to sponsor or participate in the voting on workers' compensation or automobile tort-reform legislation. The commission concluded that because less than 10 percent of her employer's income came from the sale of workers' compensation policies, she would not be violating the code of ethics if she participated in legislative matters concerning workers' compensation legislation. The commission did find, however, that Hanaway should not sponsor or participate in the voting of automobile tort-reform legislation since those activities may represent a substantial conflict. The commission found that those activities could result in direct monetary gain or loss for Hanaway's employer.

■ This advisory opinion is not the proper forum for questioning the constitutionality of an advisory opinion issued by the commission. First, as stated earlier in this advisory, we render an advisory opinion to the Governor only when the question asked concerns the constitutionality of an existing statute. *In re Advisory Opinion (Chief Justice)*, 507 A.2d at 1318–19. An advisory opinion of this court "merely represents the individual opinions of the justices of this court and is not a binding precedent." *Lerner v. Gill*, 463 A.2d 1352, 1365 (R.I.1983). Because our advisory opinions are not binding, it follows logically that the commission's advisories cannot be binding and thus do not fall within the parameters necessary for our review. Second, § 36–14–15 provides that any judicial review of any action by the commission shall be subject to the Administrative Procedures Act. That act provides, pursuant to G.L.1956 (1988 Reenactment) § 42–35–15, that the injured party is entitled to judicial review by filing a complaint in the appropriate court. Neither of the advisories has been appealed by any injured party. The Governor's question is therefore not properly before this court. We shall not consider rendering an advisory opinion when the petition is improperly before this court or procedurally defective. *In re Advisory Opinion (Chief Justice)*, 507 A.2d at 1319–20.

## IV

### Ethics Regulation 36–14–5008

We choose not to reach the merits of the arguments concerning the constitutionality of

Regulation 36–14–5008. The commission has informed us that since the initiation of this request for an advisory opinion, Regulation 36–14–5008 has been redrafted, hopefully in a manner that will make many of the challenges to the regulation moot. A public hearing on the redrafted regulation, as required before any rule-making power of the commission can be invoked, was scheduled for October 12, 1993. (*See* § 36–14–9(b), as amended by P.L.1992, ch. 436, § 1.) To render an advisory on an unapproved regulation would violate our requirements necessary for an advisory opinion and be a waste of judicial resources. This court will therefore defer its analysis of the regulation until the regulation has met the requirements of § 36–14–9(b), if an analysis is still necessary at that time.

In summary the answers to the specific questions propounded by the Governor are as follows:

*Question One:* Do the provisions of § 36–14–5, subsections (n) and (*o*), violate section 1 of the Fourteenth Amendment to the United States Constitution or article 1, section 2, of the Rhode Island Constitution "and/or seriously impinge upon the ability of the members of the executive, legislative, or judicial branches to perform" their duties? We conclude that subsections (n) and (*o*) of § 36–14–5 do not violate the Fourteenth Amendment to the United States Constitution, nor do they violate article 1, section 2, of the Rhode Island Constitution. Neither does the statute seriously impinge upon any branch of government.

*Question Two:* Do the provisions of § 36–14–5(a) violate section 1 of the Fourteenth Amendment to the United States Constitution or article 1, section 2, of the Rhode Island Constitution "and/or seriously impinge upon the ability of the members of the executive, legislative, or judicial branches to perform" their duties? We decline to express any opinion on the provisions of § 36–14–5(a) because of the pending litigation surrounding this statute.

*Question Three:* Do Ethics Advisory No. 13 and Ethics Advisory Opinion No. 92–30 violate section 1 of the Fourteenth Amendment to the United States Constitution or article 1, section 2, of the Rhode Island Constitution "and/or seriously impinge upon the abilities of the members of the executive, legislative, or judicial branches to perform" their duties? We decline to express any opinion on the ethics advisories as they are improperly before this court.

*Question Four:* Do Ethics Commission Regulations 36–14–5006, 36–14–5007, and 36–14–5008 violate section 1 of the Fourteenth Amendment to the United States Constitution or article 1, section 2, of the Rhode Island Constitution "and/or seriously impinge upon the abilities of the members of the executive, legislative, or judicial branches to perform" their duties? We conclude that Regulations 36–14–5006 and 36–14–5007 do not violate section 1 of the Fourteenth Amendment to the United States Constitution, nor do they violate article 1, section 2, of the Rhode Island Constitution. Neither do the Regulations seriously impinge upon any branch of government. We decline to express any opinion on Regulation 36–14–5008 because the regulation has been redrafted and has not yet fulfilled the applicable statutory requirements.[1]

/s/ _____
Acting Chief Justice
Joseph R. Weisberger

/s/ _____
Associate Justice
Florence K. Murray

/s/ _____
Associate Justice
Donald F. Shea

/s/ _____
Associate Justice
Victoria Lederberg

Chief Justice FAY did not participate.

---

1. We appreciate the arguments and memoranda submitted to this court by Counsel to the Governor, the Attorney General, the Ethics Commission, Common Cause, the Rhode Island Bar Association, the ACLU, and Ms. Reback, which assisted us in our consideration of these critical issues.