**In re Request for Advisory Opinion from the Governor (Warwick Station Project).**

No. 2002–615–M.P.

Supreme Court of Rhode Island.

Dec. 10, 2002.

Joseph S. Larisa, Jr., Thomas Dickinson, Rebecca Tedford Partington, Providence, for Plaintiff.

Michael St. Pierre, Warwick, for Defendant.

To His Excellency Lincoln C. Almond, Governor of the State of Rhode Island and Providence Plantations:

We have received from Your Excellency two letters dated October 16, and October 31, 2002, wherein you have propounded to us pursuant to article 10, section 3, of the

Rhode Island Constitution your request for our written opinion on the following questions:

"Does the Public Corporation Debt Management Act, [G.L.1956 chapter 18 of title 35 (Kushner Act)], which requires General Assembly approval for certain [s]tate or quasi-public debt obligations, apply to require such approval of the nonrecourse project financing of the consolidated rental car facility?"

"May the Rhode Island Airport Corporation, in implementing the customer facility charge (CFC) authorized by [G.L. 1956 § 1–2–1.1], impose a uniform charge upon all rental car customers who indirectly or directly use Warwick Station or the T.F. Green state airport, regardless of whether the customer chooses to rent from a company that has chosen to locate inside the consolidated rental car facility or from a company based in another location that provides customers with access by shuttle or other means to and from the consolidated rental car facility?"

After careful consideration of the request presented, we respectfully conclude that a response to the questions propounded would be inappropriate under the circumstances here present.

■ "Pursuant to article 10, section 3, of our State Constitution, this Court is required to give its written opinion upon any question of law whenever requested to do so by the Governor or by either chamber of the General Assembly. We have previously interpreted that constitutional mandate as requiring our response to [Y]our Excellency's request only 'when the question or questions propounded "concern the constitutionality of existing statutes which require implementation by the Chief Executive," * * * and have a bearing upon a present constitutional duty awaiting performance by the Chief Executive.'" *In re*

*Advisory to the Governor,* 732 A.2d 55, 59 (R.I.1999) (quoting *In re Request for Advisory Opinion Regarding House Bill 83– H–5640,* 472 A.2d 301, 302 (R.I.1984)).

Typically, we have interpreted the above mandate broadly. *See In re Advisory Opinion to Governor (RIAC),* 627 A.2d 1246, 1248 (R.I.1993); *In re Advisory Opinion to the Governor (DEPCO II),* 593 A.2d 1356, 1358 (R.I.1991). Arguably, every request for advisory opinion requiring statutory interpretation relates back to Your Excellency's constitutional duties.

■ However, despite our constitutional duty to respond, "this Court will not issue advisory opinions [that] require a direct or indirect exercise of our fact-finding power. The justices of this Court, when rendering advisory opinions, act 'as individuals and not as the judicial department of the state government.' * * * Because fact-finding inheres in the Court as the judicial branch of the state government, judges acting in their individual capacities lack this power and therefore lack the power to issue advisory opinions which implicate fact-finding." *In re Advisory to the Governor,* 732 A.2d at 72 (quoting *Opinion to the Governor,* 96 R.I. 358, 364, 191 A.2d 611, 614 (R.I.1963) and citing *Advisory Opinion to Governor,* 113 R.I. 586, 597, 324 A.2d 641, 647–48 (1974)).

■ The first question propounded by Your Excellency concerns the Warwick Station Project and whether Kushner Act approval is necessary for the financing of the consolidated car rental facility, a portion of the proposed intermodal facility. *See* G.L.1956 § 35–18–3(b) ("No bonds may be issued or other obligation incurred by any public corporation to finance, in whole or in part, the construction, acquisition, or improvement of any essential public facility without the prior approval of the general assembly * * *"). The second

question concerns the scope of the term "indirect use" as used in G.L.1956 § 1–2–1.1, the provision regulating CFC's. At best, both requests, in our opinion, raise mixed questions of law and fact. For example, by asking us to decide if the consolidated rental car facility is an "essential public facility" and/or an "economic development project," we believe our fact-finding powers must be invoked. To adhere to the prohibition against fact-finding in conjunction with rendering advisory opinions, we must respectfully decline to answer the questions propounded. However, we are mindful that under G.L.1956 § 42–64–4(b) the legislature has specifically stated that "[t]he exercise by the [EDC] of the powers conferred by this chapter shall be deemed and held to be the performance of an essential governmental function of the state for public purposes."

Your Excellency has raised the applicability of the "pending-litigation exception to the rendition of an advisory opinion," because of litigation filed by the car rental companies in the Superior Court subsequent to Your Excellency's request for our opinion. *In re Advisory from the Governor*, 633 A.2d 664, 676 (R.I.1993). In that case, "[a]fter receiving the Governor's request, we learned that the questions propounded regarding [the statutes at issue] [were] involved in litigation now pending in this Court and in the District Court." *Id.* Therefore, we declined to issue our opinion because:

> "[g]rave difficulties could follow if we were to give a purely advisory opinion upon the proposed question, only to be confronted later with the necessity of deciding the same question after a hearing, upon review or otherwise, in the litigated case. * * * Legal and constitutional rights [could be] unnecessarily prejudiced by our having reached a considered opinion * * * upon a material question of law which we knew to be

involved [the matter] without first having afforded [the parties] a full hearing * * *." *Id.* (quoting *Opinion to the House of Representatives*, 88 R.I. 396, 399–400, 149 A.2d 343, 345 (1959)).

Your Excellency proposes that we should decline to apply the pending-litigation exception in cases where the litigation was instituted *after* Your Excellency's request to this Court, because parties seeking to stop this Court from rendering an advisory opinion need only file a Superior Court complaint.

■ In this case, we decline to render an advisory opinion to avoid invoking our fact-finding power. However, we recognize the car rental companies' attempt to thwart Your Excellency's constitutional power to seek advisory opinions from this Court. Therefore, in the future, we may respond to a properly presented request for an advisory opinion notwithstanding litigation filed after such a request.

Accordingly, we must respectfully decline to render an advisory opinion to the questions propounded.

/s/Frank J. Williams
CHIEF JUSTICE
FRANK J. WILLIAMS

/s/Maureen McKenna Goldberg
ASSOCIATE JUSTICE
MAUREEN McKENNA GOLDBERG

/s/Joseph R. Weisberger
CHIEF JUSTICE (Ret.)
JOSEPH R. WEISBERGER

Associate Justice VICTORIA LEDERBERG did not participate.

FLANDERS, Justice. Article 10, section 3, of the Rhode Island Constitution (constitution) provides, in pertinent part,

that "[t]he judges of the supreme court *shall* give their written opinion upon *any* question of law *whenever* requested by the governor * * *." (Emphases added.) Invoking this provision, Your Excellency has requested the justices of this Court to give you our written opinions upon two questions of law relating to a proposed rental-car facility in Warwick. Given the above-quoted peremptory language in our constitution, I believe that we should comply with our constitutional duty and provide our written opinions as requested by Your Excellency on these two questions of law. *See In re Advisory Opinion to the Governor (Ethics Commission)*, 732 A.2d 55, 74 (R.I.1999) (Flanders, J.) ("Because this constitutional command is unequivocal, peremptory, and without qualification, and because it requires the members of this Court to give our written opinions upon *any* question of law *whenever* the Governor requests us to do so, I conclude that, to the extent we are able to respond, it is incumbent upon us to answer the Governor's questions and to provide him with the practical guidance and assistance that he has requested.").

I acknowledge that, in previous advisory opinions, as in this case, the justices of this Court have cited a miscellany of reasons for not answering certain questions posed to them. *See, e.g., In re Request for Advisory Opinion Regarding House Bill 83–H–5640*, 472 A.2d 301, 302 (R.I.1984) (refusing to answer the Governor's questions because to do so would require fact-finding). In my opinion, however, we have no need to engage in any fact-finding whatsoever to answer Your Excellency's questions. The relevant facts concerning the project's proposed financing and the nature of the project itself are indisputable. Moreover, in my opinion, the questions posed to us are questions of law that do not depend on the resolution of any factual issues for us to answer them. In any event, to answer Your Excellency's questions, we can and should assume that the relevant facts concerning the project and its proposed financing are what you have described them to be in the papers you have provided to us with your questions. If the facts change or turn out to be other than as represented, then, of course, the utility of our advisory opinions may be adversely affected as a result. But we do not need to find any of the facts to be as represented for us to render the advisory opinions you have requested us to provide. Otherwise, we could never answer any advisory-opinion requests if we could not assume that certain of the facts on which we are asked to opine are in reality as they have been represented to us.

Because the fact-finding reason for declining to respond to the Governor's request in this case, as well as the other potential reasons for declining to respond, all arise from previous advisory opinions of the justices, they are not binding on any justice of this Court. *See Opinion to the Governor*, 96 R.I. 358, 364, 191 A.2d 611, 614 (1963). And because, in my opinion, none of them have any basis in the constitution, they should not prevent us from responding. Instead of adhering to what the constitution mandates ("[t]he judges of the supreme court *shall* give their written opinion upon *any* question of law *whenever* requested by the governor * * *") (emphasis added), the justices of this Court have construed that provision to permit certain exceptions. I respectfully disagree.

For a variety of legitimate reasons, appellate justices do not relish answering requests for advisory opinions. These include the lack of any factual record to review, the absence of a concrete case or controversy, the potential political implications of our answers for the other branches of government, the dearth of litigants with a real stake in the outcome, the failure of opposing interests to brief the legal

issues raised at all or in a useful manner, the additional legal work that is required to answer such questions on their merits, and the nonexistence of any fact-finding or decision-making by a trial justice, jury, or initial tribunal for the justices to review and analyze before rendering their opinions. In my opinion, this palpable dislike for answering advisory-opinion requests cannot justify the act of judicially amending the constitution to create exceptions to the duty to render advisory opinions that were not included in that document. Until and unless the constitution is properly amended to change the wording of the advisory-opinion provision, I believe it is our duty as justices of the Supreme Court to answer the Governor's requests for written advisory opinions on questions of law whenever he or she asks us to do so—unless for some reason it is truly impossible for us to respond or unless the questions have no possible relevance to the Governor's performance of his or her official duties. Much as we might prefer the constitution to contain some discretionary or limiting language in this regard, it does not do so as it presently reads. Thus, our duty is to comply with the constitution as it is written, not as we would like it to read.

And the mere fact that opponents of this project have filed a lawsuit after Your Excellency posed these questions to us should not be allowed to negate our duty to respond to them. Otherwise, if any one or more opponents to the Governor's position on legal questions seek to prevent the justices of this Court from responding to his or her inquiries, they can simply file a lawsuit seeking declaratory relief, and thereby prevent us from responding as the constitution requires us to do. This is especially true in cases like this one that involve time-sensitive projects where a mere delay in resolving these legal issues can itself doom the success of such a venture.

## Question Number One

On the merits, I answer question number one in the negative: the nonrecourse financing for the proposed consolidated rental-car facility is not, in my opinion, subject to the approval requirement of the Rhode Island Public Corporation Debt Management Act, G.L.1956 chapter 18 of title 35 (the act). This proposed facility is not an "essential public facilit[y]" within the meaning of the act; rather, it is an exempt "economic development project" that will be financed by the Economic Development Corporation (EDC) through nonrecourse debt in an amount up to $120 million. Section 35–18–2(3)(4). The bonds in question will not be a general obligation of either the state, the EDC, or the Rhode Island Airport Corporation (RIAC); rather, they will be a special obligation of the EDC payable solely from revenues pledged to secure that debt, including a so-called customer-facility charge (CFC) that has been and will be paid by customers of the car-rental companies who will use the proposed facility in connection with their airport travel and with other related uses.

The act prohibits public corporations from financing, in whole or part, the construction or improvement of any essential public facility without the prior approval of the General Assembly. The term "essential public facilities" is defined in the act to mean, in pertinent part, "facilities used by any state agency, department, board, or commission, including the board of governors for higher education, to provide services to the public *pursuant to the requirements of state or federal law,* and all fixtures for any of those facilities." Section 35–18–2(4). (Emphasis added.) The proposed rental-car facility will primarily serve rental-car companies and their airport customers, as well as individuals who

park in the garage that is proposed to be included within the facility. Because the nonrecourse financing for this proposed facility will be paid entirely from nongovernmental sources—to wit: user fees charged to rental-car customers and not from the funds of any state agency—this facility is not an "essential public facilit[y]" as defined by the act. Moreover, any services to the public that are provided there will not be "pursuant to *the requirements* of state or federal law." Section 35–18–2(4). (Emphasis added.) In my opinion, the act does not apply to financing for projects that a state agency or public corporation undertakes that are merely authorized—as opposed to required—by the pertinent enabling legislation. Thus, only when the facility is to be used to provide services to the public that are *required* to be provided by state and federal law would the proposed financing be subject to the act. But projects such as this one that are merely authorized but not required by law do not meet this definition and therefore are exempt.

In my opinion, the facility also qualifies as an "economic development project" as defined in the act, § 35–18–2(3), and is therefore exempt from the need for the financing to obtain General Assembly approval. Because most of the facility will be used by car-rental companies for rental vehicles and for servicing their customers, it qualifies as a "commercial" venture within the act's definition of an economic development project ("a project relat[ing] to financing the acquisition of any land and any building or other improvement which shall be suitable for manufacturing, warehousing, or other industrial or commercial purposes"). The act also incorporates by reference the definition of "project" that is contained within the Rhode Island Industrial Facilities Corporation Act. *See* G.L. 1956 § 45–37.1–3(5) ("any building or other improvement * * * which are suitable for

use for manufacturing, warehousing, or other industrial or commercial purposes"). This definition must "be liberally construed so as to effect its purpose." Section 45–37.1–18. In my opinion, by including economic-development projects that could be undertaken by the Rhode Island Industrial Facilities Corporation within the category of projects that are exempt from General Assembly approval, the Legislature intentionally exempted the proposed financing for this type of project from the act's approval requirements.

In sum, because the proposed facility is not an "essential public facilit[y]" but, instead, qualifies as an exempt "economic development project," General Assembly approval is not required under the act for the proposed financing to proceed.

### Question Number Two

I answer the second question posed to us in the affirmative. By law, the General Assembly has authorized RIAC to impose a charge on the customers of rental-car companies for the purpose of providing funds to pay for the proposed Warwick station project. *See* G.L.1956 § 1–2–1.1. Accordingly, since July 1, 2001, rental-car companies have collected these so-called customer facility charges (CFC) from their customers. Because the General Assembly has authorized RIAC to impose CFCs upon customers who "directly or indirectly" use the Warwick station project or any of its component facilities, I believe that the applicable law does not prohibit a uniform charge, regardless of whether rental-car companies choose to locate their rental offices within the facility or at some off-site location from which they would transport their airport-using customers to and from the facility. *See Alamo Rent–A–Car, Inc. v. Sarasota–Manatee Airport Authority,* 825 F.2d 367, 369, 371–74 (11th Cir. 1987) (rejecting an equal-protection chal-

lenge to a uniform-charge scheme based on an allegation that off-site rental-car companies were being charged the same access fees as rental-car companies with locations on the airport premises); *see also Alamo Rent–A–Car, Inc. v. Board of Supervisors of Orange County,* 221 Cal. App.3d 198, 272 Cal.Rptr. 19, 25 (1990); *cf. Town of Lincoln v. City of Pawtucket,* 745 A.2d 139, 142, 144–46 (R.I.2000) (rejecting constitutional challenge to uniform rates charged by the Narragansett Bay Commission for remediating a so-called combined-sewer-overflow problem).

### Conclusion

For these reasons, I answer question number one in the negative and question number two in the affirmative.

/s/Robert G. Flanders, Jr.
ASSOCIATE JUSTICE
ROBERT G. FLANDERS, JR.