## In re ADVISORY OPINION TO the HOUSE OF REPRESENTATIVES BILL 85-H-7748.

### No. 86-269-M.P.

Supreme Court of Rhode Island.

Jan. 5, 1987.

Peter McGinn, Tillinghast Collins & Graham, for the House of Representatives.

James H. Hardy, R.I. Legal Services, Jane Perkins, Judith G. Waxman, Nat. Health Law Program, as amici curiae.

Arlene Violet, Atty. Gen., Joseph F. Dugan, Asst. Atty. Gen., as amicus curiae.

Before FAY, C.J., and KELLEHER, WEISBERGER, MURRAY and SHEA, JJ.

To the Honorable, the House of Representatives of the State of Rhode Island and Providence Plantations

We have received your request seeking the advice of the justices of this court, in accordance with the provisions of section 2 of article XII of the amendments to the Rhode Island Constitution. The question posited is summarized as follows:

"Would amending G.L.1956 (1985 Reenactment) § 23–17–6, which pertains to the licensing of health care facilities, to read that 'no license shall be issued, transferred or assigned to a business corporation whose stock is publicly traded; provided, however that any person, partnership or corporation which owned or was operating a health care facility on the effective date of this act may continue to own or operate such health care facility' violate § 1 of the Fourteenth Amendment to the United States Constitution?" [1]

We are obligated under art. XII, sec. 2, of the amendments to the Rhode Island Constitution to issue an advisory opinion at the request of the House when the question concerns the constitutionality of pending legislation. *In re Advisory Opinion,* 507 A.2d 1316, 1318 (R.I.1986).

The Fourteenth Amendment was ratified in 1868, three years after the end of the Civil War. Although scholarly debate still rages over how this amendment should be interpreted,[2] our opinion concerning the federal constitutionality of pending state legislation must be guided by United States Supreme Court precedents, since state legislative acts are ultimately answerable to that Court if they are challenged on federal constitutional grounds, *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810), as are decisions of this court resolving such challenges. *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1816). Our advisory opinion is thus necessarily, to paraphrase Holmes, nothing more than our prophecy of what the Supreme Court would do, in fact, were the constitutionality of this legislation before it.

In answering whether the proposed legislation violates the Fourteenth Amendment, we must first decide who might challenge the legislation, were it to be enacted. The most likely candidate is a publicly traded corporation that wants to be licensed as a health-care facility or a person who wants to be treated by a publicly traded corporation that cannot get licensed as a health-care facility because of the legislation.

We now look to the three provisions of section 1 of the Fourteenth Amendment under which these potential litigants might challenge the proposed legislation.

I

## PRIVILEGES OR IMMUNITIES

■ The first of the three provisions, the privileges or immunities clause, directs:

"[N]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

Any attack against the legislation by a publicly traded corporation on the ground that the legislation violates this clause would surely fail. The Supreme Court has always held that corporations are not "citizens" within the meaning of the clause and thus are not entitled to any protections it affords citizens of the United States. *See, e.g., Grosjean v. American Press Co.,* 297 U.S. 233, 244, 56 S.Ct. 444, 447, 80 L.Ed. 660, 665–66 (1936); *Orient Insurance Co. v. Daggs,* 172 U.S. 557, 561, 19 S.Ct. 281, 282, 43 L.Ed. 552, 554 (1899).

■ Although privileges or immunities

---

1. Section 1 of the Fourteenth Amendment reads:

   "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

2. *Compare* R. Berger, *Government by Judiciary* (1977) (arguing that the Supreme Court should follow the original understanding of the framers of the Fourteenth Amendment; that not to do so is unconstitutional) *with* Brest, *The Misconceived Quest for the Original Understanding,* 60 B.U.L. Rev. 204 (1980) (arguing that we should not guess how other people meant to govern a different society a hundred or more years ago; that the original understanding is neither authoritative nor binding on the Court).

challenges made by individuals are rare,[3] such a challenge against this legislation must also fail. The clause only protects those interests "arising out of the essential nature of national government and granted or secured by the Constitution," *Madden v. Kentucky,* 309 U.S. 83, 92 n. 21, 60 S.Ct. 406, 410 n. 21, 84 L.Ed. 590, 595 n. 21 (1940), and being treated by a publicly traded health-care facility in the State of Rhode Island is hardly such an interest.

## II

### SUBSTANTIVE DUE PROCESS

■ The second provision of section 1, the due process clause, states:

> "nor shall any state deprive any person of life, liberty, or property, without due process of law."

Although a corporation is not a "citizen" within the meaning of the privileges or immunities clause, it is a "person" within the meaning of the due process and equal protection clauses. *Grosjean, supra.* Hence, a due process or equal protection challenge could conceivably be made against the legislation, if enacted, by either an individual or a corporation.

The due process clause protects both property and liberty interests. Property interests protected by the clause are normally created and their dimensions defined by sources independent of the Constitution, such as state statutes or rules entitling a citizen to certain benefits like welfare or employment. *Goss v. Lopez,* 419 U.S. 565, 572–73, 95 S.Ct. 729, 735–36, 42 L.Ed.2d 725, 733–34 (1975). We perceive that no such interests would be deprived by enacting this legislation.

■ Liberty, as meant by the clause, is a broad concept including not only freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, and generally to enjoy privileges long recognized as essential to the orderly pursuit of happiness by a free people. *Board of Regents v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 2706–07, 33 L.Ed.2d 548, 558 (1972). Liberty interests include those explicit pledges of particular amendments of the Bill of Rights essential to the concept of ordered liberty, *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288, 292 (1937), as well as such implied constitutional guarantees as the right to privacy, *Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147, 176–77 (1973), and the right to travel, *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600, 615 (1969).

Unconstitutional deprivation of liberty by the state can occur two ways: procedurally or substantively. Procedural due process analysis involves, in civil contexts, looking at whether a litigant was afforded the fair-play notions of proper notice and the right to a hearing.[4] Substantive due process analysis involves looking at whether statutes improperly limit an individual's freedom to act. It is this latter analysis which would be applicable to a due process challenge against the legislation at issue.

Although for the forty years between 1897 and 1937 the Supreme Court was quite willing to scrutinize and invalidate economic regulations under the due process clause,[5] the Court today does not weigh the wisdom of state social and economic legislation, but rather allows the states broad latitude in legislating against what they find to be injurious practices in their internal commercial and business affairs. *See, e.g., North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.,* 414

---

3. The clause is largely considered dormant. *See* L. Tribe, *American Constitutional Law,* 415 n. 4 (1978).

4. In the criminal context, of course, procedural due process analysis includes looking at whether the defendant was deprived of any of the fundamental procedural safeguards he or she was entitled to under the Bill of Rights.

5. *See, e.g., Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). *See generally* L. Tribe, *American Constitutional Law* at 434–42.

U.S. 156, 165, 94 S.Ct. 407, 413, 38 L.Ed.2d 379, 386 (1973) (unanimous decision).

This is not to say, of course, that all state legislation is afforded such deference. Where the legislation infringes upon explicit constitutional rights, such as those guaranteed by the First Amendment, or upon interests fundamental to our society of ordered liberty, such as the right to travel or to privacy, the Court applies a much stricter scrutiny: legislative enactments must be narrowly drawn to express only a compelling state interest. *Roe v. Wade*, 410 U.S. at 155, 93 S.Ct. at 728, 35 L.Ed.2d at 178. But where no such guarantee or fundamental interest is infringed on by state legislation, and where the state's legislative aim is to promote the health and safety of its citizens—an aim at the core of its police power—the challenger, to prevail under the due process clause, must demonstrate that there is no rational connection between the enacted regulation and the legislative aim. *Kelley v. Johnson*, 425 U.S. 238, 247, 96 S.Ct. 1440, 1445–46, 47 L.Ed.2d 708, 715–16 (1976).

Here, the legislative aim is presumably legitimate. Amici curiae articulate probable legislative concerns when they point out that the proliferation of publicly traded health-care facilities diminishes available care for the poor:

> "Proprietary hospitals, especially those belonging to publicly traded chains, are less likely to serve the poor than not-for-profit hospitals. In four states with large concentrations of for-profit chain hospitals—Florida, Tennessee, Texas, and Virginia—investor-owned chain hospitals provide between 50% and 150% less care to the poor than non-profit hospitals and between 300% and 600% less care than public hospitals. Institute of Medicine, 'Access to Care and Investor-Owned Providers,' in *For-Profit Enterprise in Health Care* 97, 103 (B. Gray ed. 1986). "Evidence also suggests that the sale of a hospital to a for-profit chain leads to a diminution in care to the uninsured and underinsured poor. A 1986 Florida

study of the effects on uncompensated care at hospitals purchased by investor-owned corporations found that the percentage of total hospital revenue attributable to uncompensated care declined between fourteen and thirty-five percent in the three years following purchase. By contrast, hospitals that had not changed ownership increased their provision of uncompensated care by an average of five percent. Brown & Klosterman, 'Hospital Acquisitions and Their Effects: Florida, 1979–1982,' in *For-Profit Enterprise in Health Care* 303, 314 (B. Gray ed. 1986).

> "The proliferation of proprietary hospitals has placed the medically uninsured, and the hospitals that have traditionally served them, in an acute dilemma. Proprietary hospital chains market their services to patients who can pay, drawing such patients away from their traditional non-profit providers. Non-profit hospitals have been able to serve the poor, in part, because they have shifted some of the costs of providing free care onto their private pay patients. Loss of the private pay patient base reduces the ability to shift uncompensated care costs onto private pay patients and, ultimately, to provide free care. Kennedy, 'The Proprietarization of the Voluntaries,' 61 Bull.N.Y.Acad.Med. 81 (1985)."

If the legislative aim is in fact to avert the apparent decline of available health care to poor people, this objective is solidly within the police power of the state and thus legitimate. Limiting the licensing of publicly traded health-care facilities, as the proposed legislation does, is certainly an acceptable and rational means to achieve this legitimate state objective.

As long as no fundamental individual or corporate rights are infringed upon, a reviewing court will not scrutinize the means used by the Legislature to achieve an objective legitimately within the state's police power. Since there is no fundamental right entitling a publicly traded corporation to be issued a health-care license or enti-

tling an individual to be treated by such a corporation, the proposed legislation before us is constitutional under the due process clause.

## III

## EQUAL PROTECTION

The equal protection clause directs:

"nor [shall any state] deny to any person within its jurisdiction the equal protection of the laws."

■ Historically, the Supreme Court has held legislative classifications in the socioeconomic realm to be presumptively constitutional against equal protection attacks. In 1911 the Court said:

"1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary." *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78–79, 31 S.Ct. 337, 340, 55 L.Ed. 369, 377 (1911).

Hence, the vast majority of state social and economic regulations have been sustained as constitutional by the Court using this "rational basis" test. *See, e.g., Exxon Corp. v. Eagerton,* 462 U.S. 176, 195–96, 103 S.Ct. 2296, 2311, 76 L.Ed.2d 497, 513–14 (1983) (unanimous decision); *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1104–05, 6 L.Ed.2d 393, 398–99 (1961).

As with substantive due process analysis, however, the Court has strictly scrutinized legislative classifications which have infringed upon fundamental rights. *See, e.g., Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (right to vote); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (freedom of association); *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (right to procreate). It also strictly scrutinizes legislative classifications that intentionally discriminate against people on the basis of race, ancestry, alienage, national origin, legitimacy, or gender. *See, e.g., Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (alienage); *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (race); *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (ancestry).

Recently, when reviewing classifications which touch upon groups that have traditionally suffered a history of discrimination or stereotyping by the community, such as those afflicted with mental retardation, or upon fundamental rights, such as the right to travel, some members of the Court seem willing to strike down such classifications by employing a stronger rational-basis test. *See, e.g., City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (plurality opinion) (mental retardation); *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (plurality opinion) (right to travel). The various justices' opinions in *City of Cleburne* and *Zobel* reveal that currently there is disagreement on the Court regarding the standard to be applied in reviewing some equal protection cases.

Nonetheless, we think it most likely that a majority of the Supreme Court would review the legislation here under the traditional rational-basis test, deferring to the Legislature with respect to the wisdom of such regulation. The proposed legislation

**584**

impinges upon no fundamental rights. It does not appear to intentionally discriminate against any of the "suspect" classifications listed above. Nor does it discriminate against any group traditionally disfavored by the community.

For the reasons stated, we answer the question addressed to us by the House of Representatives in the negative.

Respectfully submitted,
THOMAS F. KELLEHER
JOSEPH R. WEISBERGER
FLORENCE K. MURRAY
DONALD F. SHEA

The Chief Justice participated in this opinion and agreed with its conclusion, but was not available to add his signature.