DECISION
Plaintiff Steven Ceceri ("Ceceri" or "plaintiff") appeals from a decision of the Department of Business Regulation ("DBR"), revoking his real estate broker's license and instituting fines totaling $5,000. Ceceri argues that the decision should be overturned because (1) it was rendered months beyond the sixty day period set forth in G.L. 1956 § 5-20.5-15(a)(5), (2) the sanction imposed is unduly severe, (3) it violates his substantive due process rights, and (4) it is clearly erroneous in light of the reliable, probative, and substantial evidence in the record. In opposition, the DBR maintains that it based its decision on the evidence presented at the hearing and that revoking Ceceri's real estate broker's license was appropriate given the facts of the case. This Court's jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 Facts and Travel
In 2000, Edward Fallen Sr. ("Edward Sr.") owned several properties in Rhode Island, each of which was subject to a blanket mortgage with a total outstanding balance of $92,000 due to the mortgagee, Harold Smith. (Aug. 6, 2003 Hearing Transcript at 48-50.) Included in his real estate holdings was property located at 90-92 Whitehall Street in Providence ("the Property"). On April 19, 2000, after falling ill, Edward Sr. granted his son, Edward Fallen Jr., the power of attorney over his affairs. (DBR Hearing Ex. 6.) Approximately seven months later, in December of 2000, Edward Sr. passed away, and Edward Jr. was named executor of his father's estate. (Nov. 4, 2003 Hearing Transcript at 40.)
In order to pay Edward Sr.'s debts, Edward Jr. and his wife, Pamela Fallen (collectively "the Fallens"), decided to sell the Property. (Aug. 6, 2003 Hearing Transcript at 50.) On April 27, 2000, Edward Jr. signed an "Exclusive Right to Sell Listing Agreement" ("the agreement") with Ceceri, a licensed real estate broker, for the sale of the Property. (DBR Hearing Ex. 2.) The agreement provided that Ceceri would be the sole listing agent for the Property for a term of six months, that the Property would be listed for $109,000, and that Ceceri would receive a six-percent commission of the gross sale price. Id. In addition, the agreement acknowledged Ceceri's duty to communicate all written offers to the Edward Jr. pursuant to G.L. 1956 §5-20.5-14(34). Id.
Six months passed, the agreement expired, and Ceceri had not informed the Fallens of any offers made to purchase the Property. Subsequently, Ceceri offered to purchase the real estate from the Fallens for $70,000. The Fallens accepted Ceceri's proposal, and the deal was consummated on February 16, 2001. The U.S. Department of Housing and Urban Development ("HUD") Settlement Statement set forth the financial details of the transaction and was signed by the parties at the February 16 closing. (DBR Hearing Ex. 4.) The HUD Settlement Statement reflected the $70,000 purchase price and, additionally, listed a $4,200 broker's commission and $2,500 work credit to be paid to Ceceri.Id. One week after the closing, Ceceri listed the Property for sale in the Providence Journal and in Property Line, a real estate magazine, for $139,000 and $119,000 respectively. (DBR Hearing Ex. 9, 10.) Both listings noted that new windows would be installed and included in the sale. Id.
Nearly four months after the sale, on June 5, 2001, Pamela Fallen submitted a "Real Estate Complaint Form" to the DBR alleging that Ceceri committed numerous violations of his professional duty.[1] (DBR Hearing Ex. 6.) Specifically, the complaint asserted that Ceceri acted in bad faith by "convinc[ing] [the Fallens] the property [was] worthless" and, then, by inducing the Fallens into selling him the Property for below market value. Id. Furthermore, the complaint alleged that Ceceri failed to communicate to the Fallens an offer of $88,000 for the purchase of the home.[2] Id. Finally, the Fallens claimed that Ceceri "did not act in their best interest" when he charged a broker's commission and assessed a work credit at the closing. Id. In response, Ceceri composed a letter — dated August 8, 2001 — denying the allegations, explaining his position regarding his dealings with the Fallens, and highlighting his "non-blemished record[,] . . . ethics and extremely good judgment." (DBR Hearing Ex. 1.)
In the months following the closing — while the Fallens' complaint was pending — Ceceri paid $5,350 to have the house painted, $2,770 to have new windows installed, $220 in cleaning expenses, and approximately $300 in miscellaneous expenses. (Pl.'s Appeal Memorandum at Ex. M.) Ceceri also obtained a certification declaring that the Property had achieved "lead-safe status." (Pl.'s Appeal Memorandum at Ex. N.) Ultimately, on December 28, 2001, Ceceri sold the Property for a total purchase price of $122,500. (Pl.'s Appeal Memorandum at Ex. L, Int. No. 11-12.)
On August 6, 2003 and November 4, 2003, a hearing was held before a DBR hearing officer on the allegations set forth against Ceceri. Both Pamela Fallen and Edward Fallen Jr. testified that they were not aware of the listing agreement's six month expiration date. (Aug. 6, 2003 Hearing Transcript at 29-30; Nov. 4, 2003 Hearing Transcript at 68.) Edward Jr. remembered signing the listing agreement but did not recollect receiving a copy.[3] (Nov. 4, 2003 Hearing Transcript at 29.) Edward Jr. testified that Ceceri did not explain how the value of the Property was established and that he was never shown documents concerning comparable sales. Id. at 30. Regarding Ceceri's motivation to purchase the Property, the Fallens maintained that he informed them of his plan to "use it as a rental" and, in addition, Edward Jr. stated that Ceceri told him "he was doing me a favor by taking it off my hands." (Aug. 6, 2003 Hearing Transcript at 41; Nov. 4, 2003 Hearing Transcript at 30-31.) Although Edward Jr. acknowledged that the Property needed some repairs, he claimed that Ceceri never explained the work credit that was taken on the sale. (Nov. 4, 2003 Hearing Transcript at 33.)
The Fallens stated that prior to the February 16, 2001 closing date, they received a phone call from a man — later identified as Antonio Monteiro — who spoke broken English and was interested in purchasing the Property. (Aug. 6, 2003 Hearing Transcript at 71-73; Nov. 4, 2003 Hearing Transcript at 29-30, 58-60.) They testified that although they referred Monteiro to Ceceri, they were not informed of any offer Monteiro made on the Property until he called them after the closing to ask why he was unable to buy it for $88,000. Id.
Ceceri testified that he was aware of the listing agreement's six month term and that he provided Edward Jr. with a carbon copy of the document "a minute after he signed it." (Aug. 6, 2003 Hearing Transcript at 97.) Despite answering in an interrogatory that he based his offer to purchase the Property on a discussion he had with the Fallens' attorney regarding "what would be required to satisfy the blanket mortgage," he initially testified that his offer was founded on comparable sales in the area.[4] (Id. at 98; DBR Hearing Ex. 5 at No. 16.) Ceceri noted that he and the Fallens had an understanding that the original listing price of $109,000 was a little high. (Aug. 6, 2003 Hearing Transcript at 98.) He explained his contradictory testimony and interrogatory responses by stating, "we wanted to get those interrogatories back to [the DBR] as quickly as possible . . . I didn't have much time to prepare." Id. at 99. Subsequently, he continued to testify:
 ". . . attorney Robert Ragosta and I, with the full knowledge and approval of Ed Fallens, began trying to gather payoff information for Harold Smith, who had a blanket mortgage on this property and a few others. The bottom line that Harold Smith was eventually willing to accept was a net of 60 thousand. This amount was accepted as a discharge of the mortgage located at 90, 92 Whitehall Street, the property in question in this complaint. The total payoff was roughly 92 to 100 thousand, but he settled for 60 thousand as mentioned before. Due to the fact that such a large amount was owed on the mortgage, there was no chance that the sellers could walk from any transaction that didn't net the mortgage holder at least the payoff amount, which is stated above. Therefore, it didn't matter how much less the property sold for, (inaudible) the payoff amount because the Fallens family could not benefit financially. Robert Ragosta worked very diligently on the Fallens' behalf to get Harold Smith to eventually accept 60 thousand and discharge the mortgage on the property based on the MLS sheets for this property[.]"
(Aug. 6, 2003 Hearing Transcript at 101-02.) Ceceri added that he never had the Property appraised and that "[a]n appraiser would have used the same information" that he used in evaluating its worth. Id. at 108.
Ceceri testified that he purchased the Property with the intent to fix it up and sell it and that he never told the Fallens otherwise. Id. Furthermore, Ceceri acknowledged that he did not sign a Purchase and Sale Agreement with the Fallens and that he did not sign, or prepare, the statutorily required written consent form to purchase property from a party whom he represented as a broker. Id. at 132.
Regarding the commission charge appearing on the HUD Settlement Statement, Ceceri explained why it was assessed to the Fallens in the following exchange with counsel:
 "Ms. Warren: And at this closing why did you take the commission?
 Ceceri: Because I had been working on behalf of the Fallens. As is the point [my former attorney] was making when I initially responded as a private citizen and (inaudible) the Department of Business Regulation says you were an agent because you charged a commission. So then I said, okay, then that — technically, that's the case then.
 Ms. Warren: Well, which were you acting as? Were you acting —
 Ceceri: Well, I believe I was outside of the listing contract.
 . . .
 Ms. Warren: When you bought the property in February 2001, their listing agreement had expired?
 Ceceri: Yes.
 Ms. Warren: And you were no longer their broker?
 Ceceri: Right. I technically was not their broker after the listing contract expired. There were no extensions.
 Ms. Warren: So according to this reply on August 8, 2001 the second paragraph you said, any consideration in purchasing this property by me should be considered as if I were not a licensed real estate agent and just a regular citizen purchasing a property from a "for sale by owner." We were officially out of contract and everything that developed at that point was mostly verbal in nature as is explained in the paragraphs to follow.
 Ceceri: Right.
 Ms. Warren: So were you acting as a private citizen when you bought the property?
 Ceceri: I thought I was until I found out after that by charging a commission I was not.
 Ms. Warren: Okay, so you thought when you were buying the property that you were a private citizen?
 Ceceri: Yes, and as of the date of that letter I did not have legal counsel. I didn't have anyone giving me counsel when I drafted that letter back to you.
 Ms. Warren: So if you thought you were a private citizen, why did you think you were entitled to take a commission?
 Ceceri: The commission was used as a credit just like a work credit. It was a private financier. It was — when they said whatever credits were on credit (inaudible) were fine. I used — improperly charged that commission, I would say, on that line. I could have charged it off as a work credit, and we wouldn't be having this discussion. I didn't.
 . . .
 Ms. Warren: So at the time that you took the commission though you were not acting as a licensed broker for the Fallens?
 Ceceri: That's what my statement says.
 Ms. Warren: You were acting as a private citizen? Now, in your Interrogatory Number 6, which has been entered as Joint 5, it says — well, Number 5 says, how much in commission did you receive upon purchasing the property. You said 4,200 which was used as a credit towards the purchase price. Interrogatory Number 6 says, were you acting as a real estate broker at the time you purchased the property, and you're response was, yes.
 Ceceri: (Inaudible.)
 Ms. Warren: Well, this one is the July 19th one.
 Ceceri: And I was advised by counsel telling me that because I charged a commission I was acting as a broker. So I answered yes because that's the legal definition."
(Aug. 6, 2003 Hearing Transcript at 109-13.) Later, Ceceri engaged in the following dialogue with counsel:
 "Ms. Warren: [Y]ou thought you weren't acting as a broker when you bought the house from the Fallens?
 Ceceri: That's what I initially said, yes. But I'm still a broker. A licensed broker can charge a commission.
 Ms. Warren: So you were wearing two hats? When you bought it you were a private citizen, but you were acting as a broker when you took your commission?
 Ceceri: Acting as a broker? I was a broker.
 Ms. Warren: A broker for who, yourself or for them?
 Ceceri: For myself.
 Ms. Warren: Did you disclose that to the Fallens?
 Ceceri: No. Well, I guess as part of the settlement statement it was disclosed and signed and acknowledged by them."
(Nov. 11, 2003 Hearing Transcript at 14-15.)
Thereafter, Ceceri testified regarding the work credit he received at the closing. According to Ceceri, the work credit was for "general repairs on the property." (Aug. 6, 2003 Hearing Transcript at 116.) He stated that windows need to be replaced, lead needed to be removed from the premises, the Property needed cleaning, and the porch needed repairs. Id. Ceceri acknowledged that he did not explain the work credit to the Fallens prior to the closing. Id. at 118. Throughout the hearing, Ceceri insisted that he paid fair market value for the Property given the large number of repairs that were needed to improve its condition and that his eventual profit was a result of making said improvements and the thriving real estate market. Id. at 140, 165.
Approximately one year after the hearing concluded, on December 23, 2004, the DBR issued its written decision. The hearing officer found that Ceceri was acting as the Fallens' real estate broker at the time of the sale because (1) in answering an interrogatory he stated that he "acted as a broker for Mr. Fallen from April 27, 2000 to the date of sale," (2) he testified he was entitled to a commission on the date of the sale because he held a realtor's license, and (3) he charged a commission of over $4,000 on the sale of the Property to himself. (DBR Decision at 5; DBR Hearing Ex. 5, No. 10.) As a result, the hearing officer determined that he violated numerous statutes in his dealings with the Fallens.
First, the hearing officer found that Ceceri acted in bad faith in violation of G.L. 1956 § 5-20.5-14(a)(20) by using "his position of trust as the Fallens' real estate broker to obtain a price below market value." (DBR Decision at 6.) In reaching this conclusion, the hearing officer cited the substantial difference between the purchase price, the listing prices advertised a week after the closing, and the ultimate resale price. Id. Moreover, the hearing officer observed that Ceceri realized a forty-three percent (43 %) increase in value on Property in a few months time while only investing a few thousand dollars — $2,500 of which he received as a work credit — to improve its condition. Id. The hearing officer noted that "pursuant to [Ceceri's] fiduciary duty, he should have advised [the Fallens] that making a few minor improvements or repairs for less than three thousand dollars ($3,000) would dramatically [sic] increase the value of the Whitehall property." Id. at 7. In addition, the hearing officer found that the Ceceri violated § 5-20.5-14(a)(20) by failing to obtain a Purchase and Sales Agreement thereby preventing the Fallens from understanding the true nature of the transaction. Id. at 8.
Second, it was determined that Ceceri acted on both sides of the real estate transaction in violation of G.L. 1956 §5-20.5-14(a)(7) because, as Ceceri testified, he failed to obtain written consent from the Fallens to act as an adverse party and, thereafter, he proceeded to charge a sales commission. Id. at 7. Third, the hearing officer found that Ceceri violated G.L. 1956 § 5-20.5-14(a)(13) by failing to disclose to the Fallens his true intentions — to fix up the Property and sell it — behind his purchase. Id. Next, the hearing officer concluded that Ceceri failed to make a diligent effort to sell the Property in violation of G.L. 1956 § 5-20.5-14(a)(24) because he "essentially stopped marketing the Whitehall property because he decided he wanted to acquire it below market value." Id. at 8. Finally, the hearing officer determined that Ceceri did not violate Regulation 11, Rule 20, of the Division of Commercial Licensing and Regulation by failing to transmit a written offer on the Property to the Fallens because there was no evidence in the record that a written offer was made on the Property. See 02 040 CRIR 012-7.
In the written decision, the hearing officer summarized his credibility finding with regard to Ceceri by stating,
 "A review of the entire record of these proceedings is replete with Respondent's contradictions in both his written and oral testimony. I find that the Respondent did not comport himself in a credible manner and is not believable. Respondent's answers to interrogatories contradict his oral testimony given at the hearing. Moreover, the Respondent's testimony at [the] hearing was contradictory from one day of hearing to the next."
(DBR Decision at 9.) Ultimately, the DBR adopted the hearing officer's recommendation that Ceceri's real estate broker's license be revoked and that a $1,000 fine accompany each violation of a statutory duty he committed.[5]
Ceceri filed a timely appeal with the Superior Court on January 21, 2005. On appeal, Ceceri argues that the decision should be overturned because it was rendered beyond the sixty (60) day period allotted for the issuing of DBR decisions by G.L. 1956 §5-20.5-15(a)(5). Ceceri maintains that the penalty he received was unduly severe and wholly disproportionate to similar violations by licensed real estate brokers. Furthermore, he claims that his substantive due process rights have been violated by the DBR's arbitrary exercise of power in imposing its penalty. Finally, Ceceri asserts that the DBR's decision should be set aside because it clearly erroneous in light of the reliable, probative, and substantial evidence in the record as a whole.
In response, the DBR insists that its decision should be upheld because the hearing officer appropriately considered the facts in the record in reaching his conclusion in the matter. The DBR argues that Ceceri's appeal is misplaced because he fails to acknowledge the hearing officer's role in determining the credibility of the witnesses. Moreover, the DBR maintains that the revocation of Ceceri's real estate broker's license was justified given the egregious breaches of his fiduciary duty that he committed in dealing with the Fallens. Lastly, the DBR asserts that § 5-20.5-15(a)(5) is merely directory, not mandatory, and that the tardiness of the decision constituted harmless error.
 Standard of Review
This Court's review of an administrative agency decision is governed by terms of the Administrative Procedures Act as set forth by G.L. 1956 § 42-35-15. Section 42-35-15(g) of the Act provides:
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
In reviewing an agency decision, this Court is limited to an examination of the certified record in deciding whether the agency's decision is supported by substantial evidence. Ctr. forBehavioral Health, Rhode Island, Inc. v. Barros, 710 A.2d 680,684 (R.I. 1998) (citations omitted). Substantial evidence has been defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance."Newport Shipyard, Inc. v. Rhode Island Commission for HumanRights, 673 A.2d 457, 459 (R.I. 1996). In reviewing agency determinations, this Court "must not substitute its judgment for that of the agency in regard to the credibility of the witnesses or the weight of the evidence concerning questions of fact."Costa v. Registrar of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988). Therefore, only where "factual conclusions of administrative agencies . . . are totally devoid of competent evidentiary support in the record" may this Court reverse. Bakerv. Dep't of Employment and Training Bd. of Review, 637 A.2d 360,363 (R.I. 1994) (quoting Milardo v. Coastal Res. Mgmt. Council,434 A.2d 266, 272 (R.I. 1981)). However, the Court is free to conduct de novo review of determinations of law made by the agency. Arnold v. R.I. DOL Training Bd. of Review,822 A.2d 164, 167 (citing Johnston Ambulatory Surgical Assocs., Ltd. v.Nolan, 755 A.2d 799, 805 (R.I. 2000)).
 Sixty-Day Time Limit
Regarding hearings involving the suspension or revocation of a real estate broker's license, Section 5-20.5-15(a)(5) states, "[t]he division shall render a decision on any application or complaint within sixty (60) days after the final hearing in the matter and shall immediately notify the parties to the proceedings, in writing, its ruling, order or decision." In the instant matter, the DBR rendered its decision over thirteen months after the conclusion of the hearing. As a result, Ceceri argues that the decision should be overturned pursuant to §42-35-15(g)(3) because it was made upon unlawful procedure. Ceceri claims that the sixty day limit is mandatory and that the decision should be vacated as a result of it being violated. Ceceri characterizes the delay as "grossly tardy" and states that it seriously prejudiced his personal and professional life.
The Rhode Island Supreme Court has clearly adopted a contrary position with regard to statutory time limitations for rendering decisions. In Washington Highway Dev., Inc. v. Bendick,576 A.2d 115 (R.I. 1990), our Supreme Court held that statutory provisions requiring a decision to be rendered within a certain period of time are directory, rather than mandatory, when the Legislature has not provided a sanction for the failure to meet the requirement. Id. at 117. In that case, the Court applied the rule and upheld a Rhode Island Department of Environmental Management decision rendered approximately five and a half months after the six week period prescribed by the applicable statute.Id. at 115-16. The Washington decision affirmed the Court's prior holdings in Providence Teachers Union v. McGovern,113 R.I. 169, 319 A.2d 358 (1974), and Beauchesne v. David London Co., 118 R.I. 651, 375 A.2d 920 (1977), wherein it found similar statutory language to be directive rather than mandatory.Washington, 576 A.2d at 116; see Beauchesne118 R.I. at 659-61, 375 A.2d at 924-25 (although G.L. 1956 § 28-35-27
specified that a workers' compensation trial commissioner render a decision within ten days of the hearing, a delay over nine months was excusable).
Here, the Legislature did not provide a sanction for the failure to comply with the sixty day time limit set forth in §5-20.5-15(a)(5). Therefore, pursuant to our Supreme Court precedent, the provision is to be considered directive and not mandatory. Furthermore, other than merely stating that the delay has prejudiced him, Ceceri has not pointed to any specific facts demonstrating how the delay has caused him "substantial prejudice so as to warrant judicial relief" under the Administrative Procedures Act. Washington, 576 A.2d at 117, n1. On the record before it, this Court finds that the time lag does not void the DBR decision.
 The Hearing Officer's Decision
Ceceri also claims that the hearing officer's decision was clearly erroneous in view of the reliable, probative, and substantial evidence in the record. Ceceri argues that the decision should be overturned because the hearing officer based his findings on "unreliable and untrustworthy evidence" and "ignored the most reliable and relevant pieces of evidence." (Pl.'s Appeal Memorandum at 18.) Specifically, Ceceri asserts that there was no evidence in the record indicating that he was acting as the Fallens' real estate broker at the time of the sale because the listing agreement had expired four months prior. Moreover, Ceceri maintains that the record contains no evidence that he misrepresented his intentions with regard to the purchase of the Property — i.e. that he wanted to fix it up and sell it — and that he failed to make a diligent effort to sell the Property. Ceceri argues that the Fallens' interests were protected throughout the course of the transaction by legal counsel and that any failures regarding the Fallens' understanding of the transaction — and failure to execute a Purchase and Sale Agreement — are attributable to their lawyer. Finally, Ceceri claims that the DBR hearing officer erred by relying on hearsay evidence in reaching his conclusions.[6]
Contrary to the plaintiff's assertions, the record contains substantial evidence that could have led the hearing officer to conclude that Ceceri was acting as the Fallens' real estate broker at the time of the sale. First, as the hearing officer noted in his decision, Ceceri answered an interrogatory propounded by the DBR by stating that he "acted as a broker for Mr. Fallen from April 27, 2000 to the date of sale." Second, Ceceri charged the Fallens a commission on the sale of the Property to himself. Pursuant to G.L. 1956 §§ 5-20.5-1(4)(A) and (B), a "real estate broker" is defined as one who
 "(A) [f]or a fee, commission, or other valuable consideration, or who with the intention or expectation of receiving or collecting a fee, commission, or other valuable consideration, lists, sells, purchases, exchanges, rents, leases, appraises residential property containing four (4) or fewer units, or auctions any real estate, or the improvements on real estate including options or who negotiates or attempts to negotiate any such activity;
 (B) Advertises or holds himself or herself, itself, or themselves out as engaged in those activities[.]"
Despite Ceceri's claim that he was acting as a real estate broker for himself and, therefore, could charge a commission as a buyer's broker, the hearing officer had before him testimony of record that contained evidence to the contrary. In addition to his sworn written statement that he was acting as the Fallens' broker until the date of sale, both Edward Jr. and Mrs. Fallen testified that they were not aware that the listing agreement with Ceceri had expired.[7]
Similarly, with respect to Ceceri's intentions upon purchasing the Property, the record includes evidence from which the hearing officer could deduce that Ceceri made misrepresentations. Both Edward Jr. and Mrs. Fallen testified that Ceceri told them that he planned to rent the Property after the purchase rather than fix it up to sell it. Furthermore, as the hearing officer noted, if Ceceri had informed the Fallens "that making a few minor improvements . . . for less than three thousand dollars ($3,000) would dramatically increase the value of the Whitehall property," they would not have sold it to him for $70,000. (DBR Decision at 7.)
Ultimately, the hearing officer exercised his discretion in assessing the witnesses' credibility and weighing the evidence before him. Although Ceceri may believe that the hearing officer relied on "untrustworthy" evidence, it is for the hearing officer to analyze, assess, and determine the weight to be given to the evidence. Only where the factual conclusions of the administrative agency are "completely bereft of competent evidentiary support in the record" is reversal mandated. Sartorv. Coastal Resources Mgmt. Council, 542 A.2d 1077, 1083 (R.I. 1988). Because the DBR decision was based on "relevant evidence that a reasonable mind might accept as adequate to support [the] conclusion," this Court is compelled to find that the DBR decision was based on substantial evidence and is not clearly erroneous.[8]
 The Revocation of Plaintiff's Broker's License
Ceceri also appeals the DBR decision arguing that the penalty he received — the revocation of his license — was unduly severe and characterized by abuse of discretion in violation of §42-35-15(g)(6). According to the plaintiff, the penalty he received from the DBR was far more severe than those levied against similar offenders or even those who were found to have committed more egregious acts. Ceceri points to five DBR decisions in particular where the harshest penalty imposed was a two week license suspension and a $4,000 fine. Furthermore, Ceceri emphasizes that this is his first alleged violation and asserts that he did not have a fiduciary relationship with the Fallens.
On review, a "Superior Court justice [is] not permitted to decide whether the division chose the appropriate sanction but instead to determine whether the division's finding . . . was supported by any competent record evidence." Rocha v. State ofR.I. Public Utilities Comm'n, 694 A.2d 722, 726 (R.I. 1997). Although the Rhode Island Supreme Court has not elaborated on this principle, the First Circuit Court of Appeals has explained, in the context of reviewing a federal agency's determination, that "[a]n agency's choice of sanction is not to be overturned unless the reviewing court determines it is `unwarranted in law . . . or without justification in fact. . . .'" Broad St. FoodMkt. v. United States, 720 F.2d 217, 220 (1st Cir. 1983) (quoting Kulkin v. Bergland, 626 F.2d 181, 184 (1st Cir. 1980) (quoting Butz v. Glover Livestock Comm'n Co., 411 U.S. 182,185-86 (1973))). Additionally, the First Circuit expressed its sentiment that when the Legislature "entrusts enforcement to an administrative agency, the choice of a sanction is `peculiarly a matter for administrative competence.'" Broad St. Food Mkt.,720 F.2d at 220 (quoting Kulkin, 626 F.2d at 184).
As this Court previously stated, the hearing officer's decision in this matter was supported by competent evidence in the record. Moreover, the sanction issued by the hearing officer did not constitute an abuse of discretion. See G.L. 1956 §§5-20.5-14(a)(7), (13), (20), and (24). Therefore, this Court declines to overturn the DBR's decision revoking Ceceri's real estate license pursuant to the provisions of the Administrative Procedures Act.[9]
 Substantive Due Process
Lastly, Ceceri argues that the DBR's penalty was issued in violation of his substantive due process rights. Essentially, the plaintiff asserts that the revocation of his license constituted an arbitrary governmental act that violated his liberty interest in working as a real estate broker. This Court disagrees.
"Substantive due process analysis involves looking at whether statutes improperly limit an individual's freedom to act." In reAdvisory Opinion to the House of Representatives, 519 A.2d 578,581 (R.I. 1987). A substantive deprivation of due process can occur when the government wrongfully interferes with one's liberties, such as, "freedom from bodily restraint . . . the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, and generally to enjoy privileges long recognized as essential to the orderly pursuit of happiness by a free people."Id. (citing Board of Regents v. Roth, 408 U.S. 564, 572
(1972)). "Substantive due process, as opposed to procedural due process, addresses the `essence of state action rather than its modalities; such a claim rests not on perceived procedural deficiencies but on the idea that the government's conduct, regardless of procedural swaddling, was in itself impermissible.'" R.I. Econ. Dev. Corp. v. The Parking Co.,L.P., 892 A.2d 87, 97 (R.I. 2006) (citing L.A. Ray Realty v.Town Council of Cumberland, 698 A.2d 202, 211 (R.I. 1997) (quoting Jolicoeur Furniture Co. v. Baldelli, 653 A.2d 740, 751
(R.I. 1995))). Where no fundamental interest is infringed on by state regulation and
 "where the state's legislative aim is to promote the health and safety of its citizens — an aim at the core of its police power — the challenger, to prevail under the due process clause, must demonstrate that there is no rational connection between the enacted regulation and the legislative aim."
In re Advisory Opinion, 519 A.2d at 582 (citing Kelley v.Johnson, 425 U.S. 238, 247 (1976)).
Here, although the revocation of Ceceri's real estate broker's license undoubtedly concerns his liberty interests, he has not demonstrated that any "fundamental" right has been affected.See In re Advisory Opinion, 519 A.2d at 582 (fundamental rights are things such as the right to privacy and the right to travel). As a result, the plaintiff has the burden of showing that there is no rational connection between the government's regulations regarding licensing of real estate broker's and the government's legislative aim. Unquestionably, the regulations regarding real estate broker's licenses are aimed at protecting the interests of the public, financial and otherwise, when engaging in the buying and selling of real estate. Ceceri has failed to demonstrate how the revocation of a real estate broker's license, under the circumstance where the license holder has taken advantage of the very people whom the statutory framework is intended to protect, is not rationally related to the protection of those people. In fact, the legislative scheme appears to achieve its precise purpose: it guards against the licensing of deceitful real estate brokers to further protect the public. Given these considerations, this Court finds that Ceceri's substantive due process rights have not been violated.See In re Advisory Opinion, 519 A.2d at 582 (limiting licensing is an acceptable means to achieve a legitimate state objective); see also Amsden v. Moran, 904 F.2d 748, 757
(1st Cir. 1990) (an arbitrary misapplication of the law does not amount to a constitutional deprivation) (citing CreativeEnvironments, Inc. v. Estabrook, 680 F.2d 822, 831 (1st Cir. 1982)).
 Conclusion
After reviewing the whole record, this Court finds that the DBR's decision was not clearly erroneous in view of the reliable, probative, and substantial evidence. Furthermore, the Court finds that the decision was not rendered in violation of constitutional or statutory provisions and was not an abuse of discretion. Substantial rights of the plaintiff have not been prejudiced. Accordingly, the DBR decision, revoking the plaintiff's real estate broker's license and assessing fines in the amount of $4,000, is affirmed. The parties shall submit a judgment in conformity with this decision.
[1] Attached to the complaint form was a letter composed by Pamela Fallen detailing the allegations.
[2] On Sept. 20, 2001, the Fallens submitted a signed statement from Antonio Monteiro attesting to the $88,000 offer to purchase the Property that he made to Ceceri. The statement was neither dated nor notarized. (DBR Hearing Ex. 8.)
[3] Edward Jr.'s credibility was brought into question when he was asked about two drug-related criminal convictions on his record. (Nov. 4, 2003 Hearing Transcript at 38-39.)
[4] On the day of the hearing, Ceceri printed out, and submitted into evidence, the comparable sales showing an average sale price of $67,481 for sixteen three-family homes sold between October 1, 1999 and April 27, 2000 and located within a half mile radius of the Property. (Aug. 6, 2003 Hearing Transcript at 98; DBR Hearing Ex. 13.)
[5] The written decision assess a $1,000 fine for a violation of Regulation 11, Rule 20, of the Division of Commercial Licensing and Regulation, although the decision includes contrary analysis and repeatedly states that Ceceri did not violate the rule. (DBR Decision at 8-11.) The Court is only left to conclude that this fine was erroneously included in computing the total fine amount to be $5,000. Id. at 11. Therefore, pursuant to Super. R. Civ. P. 60(a), the Court corrects this error and for the remainder of this opinion will consider the total fine amount to be $4,000.
[6] Despite this claim, the plaintiff has not cited one instance where the hearing officer specifically relied on hearsay evidence in reaching his decision. In fact, a reading of the hearing officer's decision indicates the contrary; the hearing officer explicitly discounted the Fallens' allegations — which were supported by an abundance of hearsay evidence — regarding their dealings with Monteiro in part because "Mr. Monteiro did not testify at [the] hearing." (DBR Decision at 9.) Moreover, it is it is well-established in Rhode Island that a state agency need not rigidly adhere to the rules of evidence, including the rules of hearsay, when conducting its hearing process. See,e.g., Foster-Glocester Regional Sch. Comm. v. Bd. of Review,Dep't of Labor and Training, 854 A.2d 1008, 1018-19 (R.I. 2004);DePasquale v. Harrington, 599 A.2d 314, 316-17 (R.I. 1991);Beauchamp v. De Abadia, 779 F.2d 773, 775-76 (1st Cir. 1985).
[7] Given that substantial evidence existed to support the hearing officer's decision that Ceceri was acting as the Fallens' real estate broker at the time of sale, it logically follows that Ceceri's preoccupation with buying the Property himself — and his failure to continue marketing the Property — make the hearing officer's finding that Ceceri failed to make a diligent effort to sell the Property not clearly erroneous.
[8] In sum, the plaintiff has alleged that the listing agreement expired and, therefore, his heightened, fiduciary duty to the Fallens ceased at that time. As a result, Ceceri claims that he cannot be charged with failing to make disclosures to the Fallens and failing to act in their best interest throughout the course of his purchase of the Property. It should be noted that, although not directly addressed by our Supreme Court, a number of courts have found that a real estate broker's fiduciary duty exists beyond the expiration of a listing agreement. SeeSwallows v. Laney, 691 P.2d 874, 877 (N.M. 1984) ("the expiration or absence of a listing agreement, by itself, should not absolve the real estate broker or salesperson from [his or her] obligations and duties"; Black v. Dahl, 625 P.2d 876
(Alaska 1981); Starkweather v. Shaffer, 497 P.2d 358 (Or. 1972). If such a rule were applied in the instant matter, the determination of whether Ceceri was the Fallens' real estate broker at the time of the sale would be irrelevant. The fiduciary relationship between Ceceri and the Fallens would not be severed by the expiration of the listing agreement.
[9] It should be noted that only one of the five cases cited by the plaintiff to support his contention that he received an unduly severe penalty involved a breach of a fiduciary duty. In that particular case, the breach of fiduciary duty committed by the real estate broker was arguably much less egregious than that of the plaintiff now before this Court. There, the DBR determined that the Respondent failed to discuss the ramifications of an offer and counteroffer to his clients and failed to convey a counteroffer proposed by his clients to a potential buyer. Hynesv. Parenti, DBR No. 02-L-0099 at 31 (March 10, 2003). Rather than communicate his client's counteroffer, the Respondent negotiated with another potential buyer from which he most likely would have received a higher commission. Id. at 29.